NORMA SEGARRA HERNÁNDEZ, JUAN A. MUNTANER, la SOCIEDAD LEGAL DE GANANCIALES compuesta por ambos, NORMA INÉS MUNTANER SEGARRA y MAYRA JOE MUNTANER SEGARRA, demandantes y recurridos, *v.* ROYAL BANK DE PUERTO RICO, ROYAL BANK OF CANADA y ANTILLES INSURANCE COMPANY, demandados y peticionarios.

*Número:* CE-94-499 *Resuelto:* 1ro de abril de 1998

_Herman W. Colberg, Raymond E. Morales, Rubén Colón Morales, Josefina Cruz Meléndez y Luis E. Pabón Roca_, de _Goldman, Antonetti & Córdova_, abogados de la parte peticionaria; _José Héctor Vivas_, de _Vivas & Vivas_, abogados de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR HERNÁNDEZ DENTON emitió la opinión del Tribunal.

El recurso de autos permite expresarnos en torno a la relación que existe entre la exclusividad del remedio económico que concede la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a _et seq._) a los obreros contratados por tiempo indefinido que sean objeto de un despedido injustificado; la inmunidad patronal que confiere la Ley del Sistema de Compensaciones por Accidentes del Trabajo, Ley Núm. 45 de 18 de abril de 1935, según enmendada, 11 L.P.R.A. sec. 1 _et seq._, y las acciones de daños y perjuicios por lesión al derecho a la intimidad y al derecho a la protección contra ataques abusivos a la honra, reputación y a la vida privada y familiar, consagrados en la Constitución del Estado Libre Asociado de Puerto Rico. Art. II, Secs. 1 y 8, Const. E.L.A., L.P.R.A., Tomo 1.

## I

La Sra. Norma Segarra Hernández laboró durante veinticuatro (24) años en el Departamento de Cobros del Banco de Ponce, en la ciudad de Ponce, Puerto Rico. En 1987, mientras laboraba allí, el Vicepresidente Ejecutivo del Royal Bank de Puerto Rico (en adelante el Royal Bank), Sr. Jimmy Sotomayor, se comunicó con ella para ofrecerle el puesto de Gerente del Departamento de Cobros Centralizado del Royal Bank.

Las partes realizaron varias reuniones para discutir los detalles de la oferta de empleo. Eventualmente, el entonces Vicepresidente del Royal Bank, Sr. Ismael Rodríguez, suscribió y remitió un documento a la señora Segarra con los términos finales de la oferta. La señora Segarra la aceptó, y el 1ro de junio de 1987 comenzó a laborar para esta institución en el puesto ofrecido, con una remuneración anual de veinticuatro mil quinientos dólares ($24,500).

A la llegada a su nuevo trabajo, la gerencia del Royal Bank le requirió a Segarra Hernández que firmara un contrato probatorio de servicios. A pesar de que, en la etapa de negociación, no fue advertida de que comenzaría a laborar en el Royal Bank en una posición con carácter probatorio, Segarra Hernández optó por firmar el documento. *Exhibit* conjunto Núm. II.

El período probatorio comenzó el 1ro de junio de 1987 y se extendió hasta el 1ro de septiembre del mismo año. Al finalizar dicho período, Segarra Hernández recibió una evaluación favorable. Véase el *Staff Report-Probationary Period, Exhibit* Núm. IV. En esa ocasión, fue evaluada en las áreas de responsabilidad, actitudes, precisión, habilidad para conocer los procedimientos, alerta mental, capacidad, relación con los clientes, iniciativa, juicio y capacidad organizativa, entre otros factores. Entre éstos, la señora Segarra recibió en su mayoría una calificación de "bueno". En la categoría de apariencia personal recibió una calificación de "muy bueno". Tan sólo en las áreas de juicio y organización recibió una calificación menor (*improvement required*).[1] No obstante, el desempeño general de Segarra Hernández fue calificado como "bueno". Rendido el informe, el Sr. Ismael Rodríguez lo envió al Departamento de Recursos Humanos del Royal Bank y recomendó que se le extendiera la permanencia en el puesto.

---

[1] La escala consistía de las calificaciones siguientes: excelente, muy bueno, bueno, se requiere mejoría, no aceptable y no aplica.

Es preciso destacar que a fines de agosto de ese año, aún durante la vigencia del período probatorio, la División de Auditoría del Royal Bank rindió un informe sobre la labor del Departamento de Cobros de esa institución. El informe contenía una evaluación de funcionamiento de ese departamento durante el período del 25 de noviembre de 1985 a 18 de agosto de 1987, por lo que también contenía una evaluación de la labor realizada por la señora Segarra durante su primer mes y medio de trabajo. El informe reveló diversas deficiencias que, a juicio del juez sentenciador, eran enteramente atribuibles al Gerente de Cobros anterior y no a la señora Segarra.

Así las cosas, a fines de agosto de 1987, previo a que finalizara el período probatorio, la señora Segarra fue relevada de la responsabilidad que tenía de supervisar la sección de Cobro Legal, división del banco que tramitaba los casos declarados como pérdidas y que eran referidos a trámite judicial. Posteriormente, el 25 de septiembre de 1987 el Sr. Rolando Cardona, quien se desempeñaba como ayudante del Vicepresidente del Royal Bank, le remitió un memorando a la señora Segarra en el cual le expresaba que durante los pasados tres (3) meses se había producido un aumento en la morosidad en los préstamos concedidos por este banco. *Exhibit* conjunto Núm. VI. La señora Segarra objetó el contenido del memorando y expresó por escrito su posición al respecto.

En octubre de 1987 el Sr. Ismael Rodríguez le remitió otro memorando a Segarra Hernández. En éste le notificó que se había percatado de que el plan de trabajo para octubre no se estaba cumpliendo según lo acordado. *Exhibit* VII. En otro memorando de 28 de enero de 1988 le requirió que suministrara el plan de trabajo del Departamento de Cobros correspondiente a enero.

En febrero de 1988 la señora Segarra fue evaluada nuevamente por el señor Rodríguez. En esta ocasión recibió una evaluación de 3.65 en una escala de 1 a 7. Según con-

signa el juez de instancia en sus determinaciones de hecho, el Royal Bank redondeó esa puntuación a 4, la cual es la puntuación esperada de cada empleado.[2]

En abril de 1988 la señora Segarra fue separada del Departamento de Cobros del Royal Bank y reubicada en el Departamento de Autos. En esa ocasión, el Sr. Fernando Urrego, Vicepresidente Senior del Royal Bank, le informó a Segarra que tal determinación fue tomada por recomendación del señor Rodríguez. Segarra Hernández objetó su reubicación y planteó que no se encontraba capacitada para realizar las nuevas funciones que le habían sido asignadas. Adujo que su nuevo trabajo requería que visitara establecimientos dedicados a la venta de autos. Sin embargo, ella no tenía vehículo propio. Tampoco sabía conducir, por lo que no tenía licencia para ello. Según la transcripción de evidencia, el director del Departamento de Autos del Royal Bank coincidió con ella en que no era la persona idónea para el puesto. Es necesario señalar que, al ser trasladada al Departamento de Autos, la señora Segarra Hernández continuó devengando igual remuneración y

---

[2] La hoja de evaluación contiene una escala de 1 a 7. Según ésta, los empleados cumplen las expectativas de la institución si obtienen una puntuación de entre 3 y 5; exceden las expectativas si su puntuación general es de 6 ó 7, y están por debajo de las expectativas si obtienen una puntuación menor de 3.

Por otro lado, la evaluación de noviembre de 1988 contiene varias observaciones con respecto a la labor de Segarra Hernández. Por ejemplo, en el área de destrezas de supervisión se señala que la señora Segarra:

"No ha dominado los conocimientos necesarios de las diferentes áreas que se le han asignado. Evidencia de lo anterior es el hecho de no haber podido manejar la Sección Legal del Depto. de Cobros, (eventualmente se asignó a otro supervisor). También el no tener conocimiento de todos los elementos necesarios de cobro de autos, lo que provocó que nunca se le asignara tal función." Apéndice, *Exhibit* 16, pág. 171.

Asimismo, en el área de evaluación de destrezas de supervisión, se señala que Segarra Hernández

"[n]ecesita capacitarse en el área de supervisión, ya que no ha logrado una administración adecuada del personal que ha supervisado. Evidencia de lo dicho es lo siguiente: 1) no trazó estrategias certeras para su grupo, y cuando lo hizo, no hubo seguimiento de las mismas; 2) cuando se examinaban los casos antes de echarlos a pérdida, se observó que las gestiones de sus subordinados había(n) sido inadecuadas." Íd.

el mismo nivel de beneficios que recibía como Gerente del Departamento de Cobros.

En mayo de 1988, aproximadamente un (1) mes después de la reubicación de la señora Segarra en el Departamento de Autos, el señor Rodríguez solicitó al señor Urrego la destitución de Segarra Hernández y recomendó al Sr. Rolando Cardona para el puesto de Gerente del Departamento de Cobros. Sugirió, además, que se le diera a éste el título de Vicepresidente Auxiliar. A pesar de esta recomendación, la señora Segarra fue reubicada de nuevo, esta vez al Departamento de Crédito Rotativo del banco. Allí laboró por espacio de cinco (5) meses.

Ante toda esta situación, la señora Segarra sostuvo una reunión con la Sra. Gloria Fuxá, Gerente de Recursos Humanos del Royal Bank. En ella, le comunicó lo que consideró irregularidades cometidas en el Royal Bank por sus superiores y que había detectado a lo largo de su estadía en el banco. En esa ocasión expresó que había manifestado esas irregularidades al propio Ismael Rodríguez, sin conocer que éste estaba implicado en ellas. Asimismo, expresó la existencia de tales irregularidades al Sr. Fernando Urrego.[3]

En noviembre de 1988, la señora Segarra fue evaluada de nuevo. En esa ocasión se le confirió una puntuación de 3. Según la escala de rendimiento de la institución, dicha puntuación estaba dentro de las expectativas del banco. La señora Segarra objetó esta evaluación en el propio documento al consignar que ésta se basaba en "mentiras y trucos dirigidos a encubrir irregularidades cometidas por (sus) superiores".

En marzo de 1989 Segarra Hernández se reportó al Fondo del Seguro del Estado, y el 12 de junio el Adminis-

---

[3] Las alegadas irregularidades consisten, en esencia, en que el Sr. Ismael Rodríguez concedió varios préstamos por encima de su margen prestatario a un pariente. Esta situación fue corroborada por el Royal Bank, el cual finalmente remitió una amonestación por escrito al señor Rodríguez. Apéndice, *Exhibit* 13, pág. 185.

trador de esa entidad emitió una Resolución en la cual concluyó que Segarra Hernández había sufrido un accidente del trabajo. Al cabo de los doce (12) meses de reserva del puesto que dispone la Ley del Sistema de Compensaciones por Accidentes del Trabajo sin que Segarra Hernández solicitara su reinstalación, Royal Bank dio por terminada la relación de empleo.

Con estos hechos, el 9 de marzo de 1990 Segarra Hernández instó una acción por incumplimiento contractual y de reclamación por daños y perjuicios contra el Royal Bank, contra su corporación matriz, Royal Bank of Canada, sus respectivas compañías aseguradoras y contra varios ejecutivos de la filial en Puerto Rico. Alegó, en síntesis, que entre las partes existía un contrato de trabajo por tiempo indefinido el cual fue incumplido por el Royal Bank al degradar a la señora Segarra Hernández de sus funciones sin su consentimiento. Demanda, pág. 2; Apéndice de la Petición de *certiorari*, pág. 34. Además, señaló que la alegada violación contractual le causó a la demandante un "desajuste nervioso producto del hostigamiento y las presiones indebidas a que había sido sometida por sus superiores". Íd., pág. 35.

Luego de múltiples incidentes procesales, las partes acordaron que el tribunal adjudicara inicialmente la controversia sobre la responsabilidad de la demandada, dejando la cuantificación de los daños para ulterior dilucidación. Con ese fin, el tribunal recibió la prueba de las partes entre noviembre de 1993 y enero de 1994.

Finalmente, el tribunal de instancia (Hon. Melvin Padilla Feliciano, Juez) emitió una sentencia parcial en la que resolvió que:

> La preponderancia de la prueba en el expediente de personal de la demandante desmiente la teoría de las demandadas de que su labor fuera deficiente, que estuviera incumpliendo su contrato de trabajo o que mereciera su despido, disminución en sus responsabilidades o un relevo total como gerente del Depar-

tamento de Cobros. Sentencia parcial del Tribunal Superior, pág. 8.

En virtud de lo anterior responsabilizó al Royal Bank por las actuaciones de sus empleados. A juicio del foro recurrido, "[l]a prueba demostró que la señora Segarra fue víctima de hostigamiento, presión y denigración de parte del señor Rodríguez, quien interesaba el despido de ésta por ella haber descubierto las actuaciones irregulares del propio señor Rodríguez". Sentencia parcial del Tribunal Superior, pág. 8. De igual forma, el foro a quo determinó que las codemandadas Royal Bank of Canada y Antilles Insurance Company fueron temerarias "al defenderse en el caso de autos". Íd., pág. 9.

Inconforme con esta sentencia parcial, las codemandadas —Royal Bank, Royal Bank of Canada y Antilles Insurance Company— acudieron ante nos mediante un recurso de *certiorari* en el que alegan la comisión de cinco (5) errores que consisten, fundamentalmente, en lo siguiente:

1. El foro de instancia erró en su apreciación de la prueba al determinar que Segarra Hernández fue objeto de evaluaciones, presiones, reprimendas y movimientos de personal constitutivos de ataques abusivos e injustificados a su dignidad humana.

2. El foro de instancia erró al determinar que existe una causa de acción derivada de la Constitución del Estado Libre Asociado de Puerto Rico que permita que un empleado reclame resarcimiento por las actuaciones de un patrono privado o de sus agentes, como las alegadas por la señora Segarra Hernández.

3. El foro de instancia erró si las actuaciones alegadas por la señora Segarra tan sólo establecen un derecho para reclamar el remedio económico por despido tácito injustificado que establece la Ley Núm. 80.

4. El foro de instancia erró al resolver que la inmunidad patronal que le concede al Royal Bank la Ley del Sistema de Compensaciones por Accidentes del Trabajo im-

pide que la señora Segarra Hernández pueda reclamar una indemnización por las alegadas angustias mentales y afecciones a su salud, que le produjeron las evaluaciones de su trabajo y su traslado a una posición de menor jerarquía.

5. El foro de instancia erró al concluir que la parte demandada fue temeraria en la tramitación del pleito.

Luego de examinar detenidamente los alegatos de las partes, los autos del caso, así como la transcripción de los testimonios vertidos durante los días de la vista en el foro de instancia, consideramos apropiado analizar los primeros cuatro (4) señalamientos de error de forma conjunta. Eventualmente consideraremos el restante.

## II

El Royal Bank nos señala que el tribunal de instancia erró al adjudicarle responsabilidad por los daños alegados por la señora Segarra Hernández. A su juicio, tal determinación estuvo fundamentada en una interpretación equivocada del caso *Arroyo v. Rattan Specialties, Inc.*, 117 D.P.R. 35 (1986), en el cual reafirmamos que el derecho a la intimidad —consagrado en la Constitución del Estado Libre Asociado de Puerto Rico— opera *ex proprio vigore* y que incluso puede ser invocado frente a personas privadas. Señala, además, que la decisión de instancia en el caso de autos constituyó una expansión impermisible de la norma establecida en *Arroyo v. Rattan Specialties, Inc.*, supra, que "no sólo resulta jurídicamente inaceptable, sino que además convertirá el campo de la gerencia, administración y disciplina de los recursos humanos en un inmanejable campo de batalla de litigación constitucional, con las nefastas implicaciones económicas que ello conllevaría". Petición de *certiorari*, pág. 12.

Por otro lado aduce que, aún asumiendo que esos derechos hayan sido lesionados, la señora Segarra Hernández, a lo sumo, sólo tendría derecho a reclamar el remedio pro-

visto en la Ley Núm. 80, *supra*, comúnmente conocida como la Ley de la Mesada. En la alternativa, plantea que la inmunidad patronal que le confiere la Ley del Sistema de Compensaciones por Accidentes del Trabajo impide que pueda ser demandada. Examinemos sus planteamientos.

A. En *Arroyo v. Rattan Specialties, Inc.*, supra, analizamos los contornos de los derechos a la intimidad y a la dignidad del ser humano, y a estar protegido contra riesgos contra la integridad personal consagrados en el Art. II, Secs. 1 y 8 de la Constitución del Estado Libre Asociado de Puerto Rico, *supra*, en el contexto de una relación obrero-patronal.[4] Al hacerlo, se realizó un balance entre estos derechos individuales y el derecho del patrono al pleno disfrute de su propiedad, también garantizado en la Constitución del Estado Libre Asociado de Puerto Rico. Art. II, Sec. 7, Const. E.L.A., *supra*.[5] Finalmente se concluyó que:

> En ausencia de circunstancias especiales que configuren intereses apremiantes del Estado, nuestra sociedad requiere que inclinemos la balanza en favor de la protección de los derechos del obrero a la intimidad, dignidad y a estar protegido contra riesgos para su integridad personal en el trabajo, frente al derecho del patrono al disfrute de su propiedad privada. *Arroyo v. Rattan Specialties, Inc.*, supra, pág. 63.

---

[4] Las referidas Secs. 1 y 8 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico, L.P.R.A., Tomo 1, ed. 1982, págs. 257 y 292, respectivamente, en lo pertinente disponen:

Sec. 1:

"La dignidad del ser humano es inviolable."

Sec. 8:

"Toda persona tiene derecho a protección de ley contra ataques abusivos a su honra, a su reputación y a su vida privada y familiar."

En el caso de autos es pertinente, además, lo dispuesto en la Sec. 16 de nuestra Carta de Derechos, Const. E.L.A., *supra*, pág. 327:

"Se reconoce el derecho de todo trabajador a escoger libremente su ocupación y a renunciar a ella, ... a protección contra riesgos para su salud o integridad personal en su trabajo o empleo. ..."

[5] Dispone, en parte, la sección citada:

"Se reconoce como derecho fundamental del ser humano el derecho a la vida, a la libertad y al disfrute de la propiedad." Art. II, Sec. 7, Const. E.L.A., *supra*, pág. 275.

■ Amparados en nuestros pronunciamientos previos, reafirmamos que ante lesiones a la intimidad y a la dignidad personal por parte de personas privadas, todo ciudadano tiene derecho a acudir a los tribunales para obtener un remedio interdictal, mediante el cual se ordene al patrono que cese y desista de continuar con cualquier práctica que incida sobre tales derechos. Este remedio constituye un mecanismo de naturaleza extraordinaria que permite a todo empleado "proteger su derecho constitucional a la intimidad y a su integridad personal en el trabajo". *Arroyo v. Rattan Specialties, Inc.*, supra, pág. 64.

En *Arroyo v. Rattan Specialties, Inc.*, supra, además se resolvió que todo trabajador u obrero puede acudir a los tribunales para reclamar cualesquiera daños que se le hubieran ocasionado y que sean atribuibles al patrono. De este modo, además del remedio interdictal, un obrero puede acudir a los tribunales para resarcir los daños sufridos como consecuencia de la lesión a sus derechos constitucionales, como lo son el derecho a la intimidad y el derecho a la protección contra ataques a la honra y a la reputación personal. Véanse: *Acevedo v. Western Digital Caribe, Inc.*, 140 D.P.R. 452 (1996); *Porto y Siurano v. Bentley P.R., Inc.*, 132 D.P.R. 331 (1992).

■ Ahora bien, en cuanto a la exclusividad del remedio provisto en la Ley Núm. 80, *supra*, se afirmó que aunque, de ordinario, un trabajador u obrero que sea contratado sin tiempo determinado y que es despedido injustificadamente, *sólo* tiene derecho a dicho remedio, "una excepción a esta norma es que el despido se haga con el propósito y la intención de frustrar o subvertir, o que tenga el efecto de frustrar o subvertir una clara política pública". (Escolio omitido.) *Arroyo v. Rattan Specialties, Inc.*, supra, pág. 65.

■ Ya en *Rivera v. Security Nat. Life Ins. Co.*, 106 D.P.R. 517, 527 (1977), habíamos intimado esta posibilidad

al expresamente afirmar que la exclusividad de remedios de las leyes laborales "no excluy[e] la responsabilidad civil de un patrono por conducta torticera en que incurriere por otros motivos que no sean la mera violación de una disposición de las leyes del trabajo". Así pues, la exclusividad del remedio provisto en la Ley Núm. 80, *supra*, como indemnización por los daños que le causa el despido —*Alvira v. SK & F Laboratories Co.*, 142 D.P.R. 803 (1997)— subsiste con relación al *mero despido sin justa causa* "si con el despido concurren otras actuaciones torticeras, que sean independientes al mismo, entonces procede que se responsabilice al patrono a base de dicha conducta". (Escolio omitido.) *Porto y Siurano v. Bentley P.R., Inc.*, supra, pág. 342 (en donde expresamos claramente que la reclamación al amparo del Art. 1802 del Código Civil, 31 L.P.R.A. sec. 5141, allí en disputa, se efectuaba en virtud de ciertas imputaciones difamatorias efectuadas por el patrono al despedir al demandante). Véanse, además: *Acevedo v. Western Digital Caribe, Inc.*, supra; *Delgado Zayas v. Hosp. Int. Med. Avanzada*, 137 D.P.R. 643 (1994).

■ En virtud de lo anterior, queda claro que cuando un obrero contratado sin tiempo determinado es despedido sin justa causa y, además, ha sido objeto de actuaciones que lesionan su derecho a la intimidad o que son constitutivas de ataques a su integridad personal, puede reclamar el pago de la compensación económica en concepto de la mesada y puede, también, instar una acción para reclamar por los daños y perjuicios que dichas actuaciones le han causado. En tal caso, la reclamación por daños se da en función de las actuaciones antijurídicas independientes al hecho del despido que resultan indemnizables al amparo de nuestro ordenamiento jurídico. Claro está, si luego de que el obrero querellante presenta toda su prueba queda demostrado que tan sólo hubo un despido injustificado y que no mediaron actuaciones antijurídicas compensables

al amparo del Art. 1802 del Código Civil de Puerto Rico, *supra*, dicho obrero tan sólo tiene derecho al remedio provisto en la citada Ley Núm. 80.

■ B. La Ley del Sistema de Compensaciones por Accidentes del Trabajo, por su parte, es otra legislación de naturaleza remedial que pretende brindar al obrero ciertas protecciones y beneficios, particularmente en el contexto de accidentes ocurridos en el escenario del trabajo.[6]

Esta ley establece un esquema de seguro compulsorio cuya finalidad es "proveerle a los obreros que sufren alguna lesión o enfermedad que ocurra en el curso del trabajo y como consecuencia del mismo, un remedio rápido, eficiente y libre de las complejidades de una reclamación ordinaria en daños". *Pacheco Pietri y otros v. E.L.A. y otros*, 133 D.P.R. 907, 914 (1993). Sin embargo, mientras el obrero obtiene de forma rápida apoyo económico y el tratamiento médico, cuando sufre una lesión durante el curso del empleo y como consecuencia de éste sin tener que probar que ésta fue producto de negligencia del patrono, éste adquiere inmunidad contra cualquier acción por daños que el obrero, de ordinario, podría instar en su contra en relación con los incidentes o las circunstancias que originaron la lesión. *Admor. F.S.E. v. Flores Hnos. Cement Prods.*, 107 D.P.R. 789, 792 (1978). Se trata de un esquema que establece una responsabilidad objetiva y social que pretende evitar que los obreros queden en una situación de desamparo al tener que demostrar judicialmente la negligencia del patrono para poder obtener algún tipo de indemnización. *Santiago Hodge v. Parke Davis Co.*, 126 D.P.R. 1, 9 (1990).

---

[6] A tenor de su Art. 2, la Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 2, aplica

"... a todos los obreros y empleados que trabajen para los patronos a quienes se refiere el párrafo siguiente, que sufran lesiones o se inutilicen, o que pierdan la vida por accidentes que provengan de cualquier acto o función inherente a su trabajo o empleo y que ocurran en el curso de éste, y como consecuencia del mismo o por enfermedades o muertes derivadas de la ocupación ...."

■ Así, mientras la Ley Núm. 80, *supra*, provee un remedio de naturaleza económica por razón de despido injustificado, la Ley del Sistema de Compensaciones por Accidentes del Trabajo provee un remedio económico y médico por razón de haber sufrido una lesión en el curso del empleo y como consecuencia de éste. Se trata de dos (2) estatutos con un ámbito de aplicabilidad distinto. Puede ocurrir, por lo tanto, que un empleado que se acoja a los beneficios del Fondo del Seguro de Estado, y que posteriormente se reinstale en su trabajo, sea cesanteado injustificadamente. En los casos apropiados, podría ser acreedor a la mesada dispuesta en la Ley Núm. 80, *supra*, aun cuando previamente estuviera acogido a los beneficios del Fondo del Seguro del Estado.[7]

■ En cuanto a la inmunidad que confiere la Ley del Sistema de Compensaciones por Accidentes del Trabajo a los patronos asegurados, hemos sido enfáticos al expresar que ésta tiene un carácter absoluto. *Admor. F.S.E. v. Flores Hnos. Cement Prods.*, supra, pág. 792. Asimismo, hemos dejado establecido claramente que contra un patrono asegurado no existe causa de acción alguna relacionada con la lesión ocurrida en el empleo y como consecuencia de éste, independientemente del grado de negligencia atribuible al patrono. *Torres Solís et al. v. A.E.E. et als.*, 136 D.P.R. 302 (1994); *Santiago Hodge v. Parke Davis Co.*, supra, pág. 8; *Vda. de Andino v. A.F.F.*, 93 D.P.R. 170, 181 (1966). De este modo, el único remedio que tiene el obrero ante un accidente durante el curso del empleo cuando su patrono está asegurado es el que provee la Ley del Sistema de Compensaciones por Accidentes del Trabajo.

■ Según este esquema, sin embargo, existen excepciones. Una de ellas la establece la propia ley, la cual

---

[7] Debemos advertir que, como más adelante señalamos, la Ley del Sistema de Compensaciones por Accidentes del Trabajo impone a todo patrono la obligación de reservar a los empleados inhabilitados para el trabajo su puesto durante un período de doce (12) meses. 11 L.P.R.A. sec. 7.

permite como excepción que un obrero que sufra un accidente en el escenario de trabajo inste una acción de daños y perjuicios cuando su patrono no está asegurado. Véanse: Arts. 15 y 20 de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. secs. 16 y 21. Véanse, además: *Díaz Medina v. Santiago del Toro*, 110 D.P.R. 139 (1980); *Vélez Sánchez v. Comisión Industrial*, 107 D.P.R. 797 (1978). Asimismo, la inmunidad patronal conferida por la ley tampoco se extiende a lesiones producidas intencionalmente por el patrono. *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485, 501 (1985). En este supuesto, la posible conducta ilegítima —y en algunos contextos posible conducta delictiva— no está inmune de una reclamación ordinaria de daños, ya que tal actuación no puede ser razonablemente considerada como una actuación vinculada al desempeño normal del empleo.

Una lesión que resulta compensable al amparo de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, de ordinario, activa la inmunidad patronal. Sin embargo, el hecho de que la lesión no sea compensable no implica necesariamente que no opere la inmunidad patronal. En *Pacheco Pietri y otros v. E.L.A. y otros*, supra, pág. 919, resumimos la norma aplicable al respecto en los términos siguientes:

> Un obrero que sufre una lesión, en el curso de su empleo y como consecuencia de éste, queda cobijado bajo la Ley de Compensaciones por Accidentes del Trabajo. El hecho de que la lesión no resulte en una incapacidad y, por ende, no sea compensable, no afecta la cubierta de la ley. Si es una lesión producto de un accidente del trabajo, le aplica la exclusividad del remedio; o sea, el patrono queda cobijado bajo la inmunidad patronal y el obrero tiene derecho a los beneficios de asistencia médica y apoyo económico que la ley provee.

Para decidir si un patrono está cubierto por la inmunidad que confiere la ley sólo es necesario determinar si el obrero ha sufrido un accidente dentro del ámbito de la

cubierta de la ley. Para esto es preciso examinar si éste se origina como resultado de realizar una función inherente al trabajo "o que ocurra o se agrave en el curso de éste". *Alonso García v. Comisión Industrial*, 102 D.P.R. 689, 699 (1974). Es decir, para que el patrono pueda invocar con éxito la inmunidad patronal tan sólo se requiere evaluar si existe un nexo o una relación causal entre la lesión del obrero y su trabajo.

Con toda la discusión precedente en mente, abordemos las controversias que presenta el caso de autos.

### III

El Royal Bank señala que Segarra Hernández tiene derecho de forma exclusiva a la mesada dispuesta por la Ley Núm. 80, *supra*, en virtud de que las actuaciones por las cuales reclama indemnización, de haber ocurrido, tan sólo serían constitutivas de un despido tácito o abandono constructivo, según definido en el Art. 5 de la Ley Núm. 80, *supra*, 29 L.P.R.A. sec. 185e, y, por lo tanto, este precepto legal sería el que aplicaría de forma exclusiva.

Segarra Hernández, por su parte, nos señala que su renuncia no estuvo motivada por ninguna de las circunstancias dispuestas en el citado Art. 5 de la Ley Núm. 80, *supra*, sino que "dejó de trabajar cuando desarrolló una incapacidad ocasionada por las actuaciones de sus superiores". Oposición a la expedición del auto de *certiorari*, pág. 12. En la alternativa plantea que aún asumiendo que sus circunstancias configuren una situación de despido tácito, en nuestro ordenamiento jurídico existe una clara política pública de proteger derechos constitucionales de los empleados que no puede ceder ante situaciones como la descrita por ella.

Surge de los autos que la señora Segarra Hernández asistió regularmente a su trabajo en el Royal Bank hasta mediados de marzo de 1989, cuando comenzó a ausentarse

por razones de enfermedad. El 15 de marzo de 1989 acudió al Fondo de Seguro del Estado a solicitar sus servicios. Eventualmente, el 12 de junio del mismo año, dicha entidad emitió una resolución en la cual concluyó que la señora Segarra Hernández "sufrió un accidente de trabajo mientras realizaba funciones inherentes en el curso y como consecuencia del empleo" y dispuso que era acreedora a la protección contemplada por la Ley de Compensaciones por Accidentes del Trabajo. Apéndice de la Petición de *certiorari, Exhibit* conjunto Núm. XVIII, pág. 281.

Segarra Hernández no solicitó la reinstalación en su puesto dentro del término de doce (12) meses que dispone el Art. 5a de la Ley del Sistema de Compensaciones por Accidentes del Trabajo, 11 L.P.R.A. sec. 7. Véase, además, *Vélez Rodríguez v. Pueblo Int'l, Inc.*, 135 D.P.R. 500 (1994). Ante ello, el Royal Bank optó por prescindir de sus servicios.

A juicio del Royal Bank, el cuadro fáctico descrito configura un despido según los términos de la Ley Núm. 80, *supra*. No tiene razón.

El Art. 5 de la Ley Núm. 80, *supra*, dispone:

> A los efectos de [esta ley] se entenderá por despido, además de la cesantía del empleado, su suspensión indefinida o por un término que exceda de tres (3) meses, excepto en el caso de empleados de industria y negocios estacionales o la renuncia del empleado motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra.

Del texto anterior surgen cuando menos tres (3) situaciones concebibles como un despido: (1) la cesantía del empleado; (2) suspensión indefinida que se prolongue por un período mayor de tres (3) meses, y (3) una renuncia del empleado motivada por actuaciones del patrono, tales como la imposición de condiciones de trabajo onerosas, la reducción de salario y el descenso de puesto, entre otras.

La primera circunstancia dispuesta como despido en la Ley Núm. 80, *supra*, es la cesantía del empleado. En el caso de autos, esa fue precisamente la situación ocurrida. La relación de empleo entre las partes finalizó formalmente cuando el Royal Bank notificó a Segarra que prescindía de sus servicios. El hecho de que Segarra Hernández estuviera acogida a los beneficios que provee el Fondo del Seguro del Estado no altera la conclusión de que dejó de laborar para el Royal Bank al ser cesanteada cuando este banco pudo ejercer esa facultad, según los términos de ley. Sin embargo, para que se configure un despido compensable al amparo de la Ley Núm. 80, *supra*, se requiere algo más. Es preciso que el despido sea injustificado.

Como indicamos, Segarra Hernández no solicitó la reinstalación a su puesto en el Royal Bank dentro del período de doce (12) meses que establece la Ley del Sistema de Compensaciones por Accidentes del Trabajo. Como se sabe, este es un término de caducidad que comienza a transcurrir a partir de la fecha cuando ocurrió el accidente o la enfermedad laboral. *Alvira v. SK & F Laboratories Co. y otros*, supra.

> La Legislatura estimó razonable dicho período para proteger el derecho del trabajador a retener su empleo, estableciendo así, un balance entre los derechos del patrono y los del empleado lesionado. Esta no tuvo la intención de establecer una obligación al patrono de reservar el empleo del obrero indefinidamente. *Torres v. Star Kist Caribe, Inc.*, 134 D.P.R. 1024, 1033 (1994).

Transcurrido este término el patrono puede despedir al empleado si éste aún no ha sido dado de alta del Fondo del Seguro del Estado. La cesantía de un empleado en estas circunstancias no configura un despido injustificado, ya que la propia Ley del Sistema de Compensaciones por Accidentes del Trabajo lo presenta como una prerrogativa del patrono ante la ausencia de una oportuna solicitud de reinstalación al puesto por parte del obrero lesionado. Por

ello, resulta forzoso concluir que, en el caso de autos, Segarra Hernández no es acreedora a los beneficios dispuestos en la Ley Núm. 80, *supra,* y que, por lo tanto, no erró el foro de instancia al no concederlos.

Procede, entonces, examinar los demás planteamientos del Royal Bank.

## IV

Royal Bank nos plantea que debido a que Segarra Hernández se acogió a los beneficios que concede el Fondo del Seguro de Estado le cobija la inmunidad patronal que confiere la Ley del Sistema de Compensaciones por Accidentes del Trabajo.

Ciertamente, en el caso de autos, el Administrador del Fondo del Seguro del Estado concluyó que la señora Segarra había sufrido un accidente del trabajo, según los términos de la Ley de Compensaciones por Accidentes del Trabajo. A la luz de esta determinación la señora Segarra Hernández recibió ciertos beneficios dispuestos por ley.

La existencia de una lesión compensable al amparo de la ley, de ordinario, activa la inmunidad patronal. Sin embargo, es sabido que esta norma general tiene excepciones, como lo son las actuaciones intencionales del patrono y las actuaciones discriminatorias del patrono que violen una clara política pública. Las alegaciones de Segarra Hernández contenidas en su demanda judicial se enmarcan en estas excepciones. En vista de ello, procede examinar si en efecto el Royal Bank violó los derechos constitucionales alegados de forma tal que se configure una de las excepciones que ameritarían excluir el caso de autos de la aplicabilidad de la inmunidad patronal que confiere la Ley del Sistema de Compensaciones por Accidentes del Trabajo.

# V

■ Los derechos a la intimidad y a la protección contra ataques abusivos a la honra y a la reputación personal consagrados en las Secs. 1 y 8 de nuestra Carta de Derechos, *supra*, tienen especial preeminencia según nuestro esquema constitucional.([8]) Ambas disposiciones constitucionales imponen al Estado una función dual: abstenerse de actuar en una forma que viole el ámbito de autonomía e intimidad individual y actuar de forma positiva en beneficio del individuo. Véase J. Trías Monge, *Historia Constitucional de Puerto Rico*, Río Piedras, Ed. U.P.R., 1982, Vol. II, pág. 200.

■ Al describir estos derechos en el esquema constitucional estadounidense, el Tribunal Supremo de Estados Unidos ha expresado que los intereses protegidos por el derecho a la intimidad son esencialmente dos (2): "[u]no es el interés individual de evitar la divulgación de asuntos personales y el otro es el interés de poder tomar ciertas decisiones importantes con independencia". (Escolios omitidos y traducción nuestra.) *Whalen v. Roe*, 429 U.S. 589, 599–600 (1977).

■ En nuestra jurisdicción hemos afirmado que el derecho a la vida privada y familiar "impone a *toda persona* el deber de no inmiscuirse en la vida privada o familiar de los demás seres humanos". (Énfasis suplido.) *Colón v. Romero Barceló*, 112 D.P.R. 573, 576 (1982). Por su importancia, hemos reconocido que opera *ex proprio vigore*, sin necesidad de que concurra el requisito de acción estatal para invocarlo frente a personas particulares. Asimismo,

---

([8]) Sobre la relación entre ambas disposiciones constitucionales, la Comisión de Carta de Derechos de la Asamblea Constituyente afirmó:

"La protección contra ataques a la honra, reputación y vida privada constituye también un principio que complementa el concepto de la dignidad humana mantenido en esta Constitución. Se trata de la inviolabilidad personal...." 4 Diario de Sesiones de la Convención Constituyente 2566 (1951).

este derecho puede hacerse valer mediante una demanda por daños al amparo del Art. 1802 del Código Civil de Puerto Rico, *supra*, de forma tal que el agraviado pueda resarcirse por "los perjuicios causados por una violación del deber de no intervenir con la [intimidad] de los demás ...". *Colón v. Romero Barceló*, supra, págs. 576–577.[9]

Un examen de nuestros previos pronunciamientos, así como de la jurisprudencia federal, revela que este derecho se lesiona, entre otras instancias, cuando se limita la facultad de un individuo de tomar decisiones personales, familiares o íntimas, *Pueblo v. Duarte Mendoza*, 109 D.P.R. 596 (1980), *Roe v. Wade*, 410 U.S. 113 (1973); cuando se requiere exponer públicamente la vida íntima de una pareja para poder divorciarse, *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978), o cuando se limita la facultad de la decisión de utilizar anticonceptivos, *Griswold v. Connecticut*, 381 U.S. 479 (1965), *Eisenstadt v. Baird*, 405 U.S. 438 (1972).

Asimismo, se lesionan los derechos a la intimidad y a la protección contra ataques abusivos a la honra y a la reputación personal cuando se viola la tranquilidad del hogar, *Sucn. de Victoria v. Iglesia Pentecostal*, 102 D.P.R. 20 (1974), y *E.L.A. v. Hermandad de Empleados*, 104 D.P.R. 436 (1975); cuando se hostiga a una persona mediante el uso del sistema telefónico, *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328 (1983), o cuando la constante presencia de una foto en los medios de comunicación representa una indebida intromisión en la vida familiar, *Colón v. Romero Barceló*, supra.

Por tratarse de un derecho invocable frente a personas privadas, el patrono está obligado a no infringir la zona de

---

[9] Dispone el Art. 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. sec. 5141:

"El que por acción u omisión causa un daño a otro, interviniendo culpa o negligencia, está obligado a reparar el daño causado. La imprudencia concurrente del perjudicado no exime de responsabilidad, pero conlleva la reducción de la indemnización."

autonomía individual de sus empleados, que protege el derecho a la intimidad. Por ello, una violación al ámbito individual constitucionalmente protegido impone al patrono la obligación jurídica de reparar el daño causado. Sin embargo, para probar las alegaciones de una causa de acción por violación al derecho a la intimidad, que sea originada en el contexto de una relación laboral, el reclamante debe presentar prueba de actuaciones concretas del patrono que incidan sobre áreas de su vida íntima o familiar.

En el caso de autos no estamos ante ninguna de las situaciones que antes hemos considerado como nocivas a estos derechos constitucionales. No estamos ante una actuación que involucre la difusión indiscriminada de información íntima o personal de Segarra Hernández o que incida irrazonablemente sobre su tranquilidad personal o familiar. Tampoco estamos ante divulgación de información falsa o calumniosa o ante actuaciones que limiten su facultad de tomar decisiones sobre su vida íntima o familiar.

De la prueba presentada por Segarra surge que los aspectos señalados para fundamentar su reclamación consisten esencialmente en: (1) que los Sres. Ismael Rodríguez y Rolando Cardona le remitieron ciertos memorandos que consideró ofensivos y que tuvieron el propósito de hostigarla; (2) que fue removida de su puesto de Gerente del Departamento de Cobros Centralizado y relocalizada en otras dependencias del banco, y (3) que fue objeto de ciertas humillaciones e insultos por parte de sus superiores.

En cuanto a los memorandos remitidos a Segarra Hernández, debemos destacar que éstos consisten en cinco (5) memorandos remitidos en el período comprendido entre junio de 1987 y marzo de 1989, fecha cuando se acoge a los beneficios del Fondo del Seguro del Estado. En todos ellos se le requiere a Segarra Hernández la preparación de ciertos informes o que provea determinada información. Éstos no contienen ningún tipo de lenguaje que pueda ser consi-

derado ofensivo u hostigante.(¹⁰) Tampoco nos parece que el

---

(¹⁰) Los memorandos aludidos son:

(1) Memorando de 25 de septiembre de 1987 de Rolando Cardona dirigido a Segarra Hernández, cuyo contenido es el siguiente:

"Confirmo conversación que sostuviéramos durante el día de hoy relacionado con el asunto de referencia.

"En los pasados tres meses se ha venido observando un aumento en la delincuencia (sic) de préstamos personales y segundas hipotecas. Las pérdidas en los préstamos personales han aumentado en forma considerable y de igual forma los no productivos.

"El 14 y 21 de septiembre cotejé la producción de llamadas telefónicas de sus ajustadores y de este análisis se desprende que la misma está muy por debajo de lo requerido.

"La razón principal por lo cual se le relevó de la responsabilidad de la Sección de Cobro Legal fue para que usted concentrara todo su esfuerzo en el área Pre-Legal y se lograra una reducción en la delincuencia. Esto hasta el momento no se ha logrado.

"Es de suma importancia, tanto para usted como para nuestra Institución, mejore la estrategia y el esfuerzo de los cobros para lograr detener y disminuir el aumento que se ha venido reflejando." Apéndice, *Exhibit* conjunto Núm. VI, pág. 259.

(2) Memorando de 16 de octubre de 1987 remitido por Ismael Rodríguez, cuyo contenido transcribimos:

"Luego de revisar el plan de trabajo que se le estableció para el mes de octubre, me he percatado que el mismo no se está llevando según lo acordado. Hasta el día de ayer aún no se había culminado con el primer ciclo de cartas y llamadas telefónicas. Esto puede perjudicar los resultados finales de la delincuencia al cierre de mes, por lo cual tendrá usted que doblar el esfuerzo de los cobros inmediatamente.

"Del análisis que se efectuara de los cobros en los préstamos transferidos a pérdida en el mes de septiembre, se desprende que los mismos carecían de gestiones adecuadas y, en varios de estos, el esfuerzo de los cobros se llevó a cabo en el último mes. Esta situación tiene que ser corregida de inmediato.

"Es su responsabilidad el administrar su área de una forma adecuada para lograr disminuir la delincuencia (sic) y esto aún no se ha logrado, por lo cual espero resultados positivos a (sic) la mayor brevedad." Apéndice, *Exhibit* conjunto Núm. VII, pág. 260.

(3) Memorando de 28 de enero de 1988 remitido por Ismael Rodríguez que expresa:

"Aún no he recibido el Plan de trabajo del Departamento de Cobros perteneciente al mes de enero, luego de haberme comunicado con usted y requerirle el mismo.

"Agradeceré que a (sic) la mayor brevedad me haga llegar este Plan en o antes del 31 de enero. Referente al Plan de Trabajo del mes de febrero, deberá estar en mi oficina el día 1ro de febrero para ser discutido conmigo a las 9:30 a.m.

"Espero que esta situación no se repita en los meses subsiguientes." Apéndice, *Exhibit* conjunto Núm. VIII, pág. 261.

(4) Memorando de 8 de marzo de 1988 remitido por Ismael Rodríguez:

"En el día de hoy he sido informado que las pre-evaluaciones correspondientes al primer trimestre del año en curso del personal bajo su supervisión, aún no han sido discutidas con cada uno de éstos.

"Agradeceré me informe de inmediato cuáles son las razones del porqué [sic] a esta fecha estas pre-evaluaciones permanecen sin discutirse y qué acción usted tomará para que esta situación no se repita en el futuro." Apéndice, *Exhibit* conjunto Núm. X, pág. 263.

número de memorandos aludidos por la señora Segarra Hernández en su demanda —cinco (5) en un período de casi dos (2) años de trabajo para el Royal Bank, uno de los cuales no fue dirigido a ella— pueda ser considerado como constitutivo de hostigamiento.

 Royal Bank presentó prueba que apoya sus alegaciones de aumento en la morosidad y que el trabajo realizado por el Departamento de Cobros no era el óptimo. Parte considerable de esa prueba es documental, ante la cual —como se sabe— este Foro está en igual posición que un tribunal de instancia para examinarla y evaluarla. *Torres Arzola v. Policía de P.R.*, 117 D.P.R. 204 (1986).

Nuestra evaluación de la prueba documental revela que el departamento dirigido por la señora Segarra estaba confrontando problemas desde antes de que ésta llegara a laborar en él. Sin embargo, éstos no fueron corregidos luego de su llegada. Los memorandos que le fueron remitidos a Segarra se enmarcan en este contexto. Éstos están más próximos a las actuaciones legítimas de un patrono para mejorar el funcionamiento de uno de sus departamentos, que a las actuaciones constitutivas de ataques abusivos a la integridad personal de un empleado.

Por otro lado, las circunstancias según las cuales ocurre

---

(5) Memorando de 19 de mayo de 1988 del señor Ismael Rodríguez dirigido al Sr. Fernando Urrego en relación al desempeño·de la señora Segarra Hernández en el Departamento de Cobro Legal, el cual señala, en lo pertinente, lo siguiente:

"De todas estas comunicaciones no se obtuvieron resultados de parte de la señora Muntaner [Segarra Hernández] y, por consiguiente, no se ha observado una mejoría en la fase administrativa ni en la fase operacional. ...

"En virtud de la reorganización emprendida a pedido suyo para mejorar la eficiencia del Departamento, absorbiendo de vuelta la supervisión de la Sección Legal y las funciones de cobros y de seguros del Departamento de Autos, el cargo de cabeza del Departamento de Cobros ha tomado una nueva dimensión en cuanto al volumen de trabajo y el volumen de personas a [sic] supervisar. Tanto es así, que se ha necesitado mi intervención personal, así como la de mi asistente, Rolando Cardona.

"Estimamos que la señora Muntaner [Segarra Hernández] dado el rendimiento mostrado hasta la fecha, no está capacitada para manejar el Departamento así redimensionado [sic] en la forma en que esperamos. Por tal motivo, me permito recomendar la reorganización siguiente:

"1. Prescindir de los servicios de la señora Muntaner [Segarra Hernández]. ...".
Apéndice, *Exhibit* conjunto Núm. XI, págs. 264–265.

la separación de la recurrida del Departamento de Cobros y su traslado al Departamento de Autos, y eventualmente al Departamento de Crédito Rotativo, precedida por una disminución de las responsabilidades que tenía como Gerente del Departamento de Cobros, no nos parece que tengan el alcance planteado por la recurrida en su reclamación. Más aún, cuando la demandante no experimentó disminución alguna en la remuneración económica que recibía y continuó disfrutando del mismo nivel de beneficios como empleada gerencial. Además, de la prueba se desprende que a fines de 1988 recibió del Royal Bank un aumento salarial de quinientos dólares ($500) anuales. T.E., pág. 122.

Asimismo, las evaluaciones de las cuales fue objeto la señora Segarra Hernández por parte de la gerencia del Royal Bank revelan que si bien su desempeño era satisfactorio y, según la escala de evaluación, cumplía con las expectativas de la agencia, su desempeño general estaba por debajo del promedio, una puntuación de 3 en una escala de 1 a 7. El hecho de que recibiera una evaluación que reflejaba que cumplía *mínimamente* con lo esperado por la institución no constituía un impedimento para que ésta reestructurara su departamento y transfiriera personal a la luz de las necesidades legítimas de la institución, siempre que al hacerlo no violara disposiciones estatutarias o derechos constitucionales de los empleados.

Finalmente, una lectura de la transcripción de evidencia no revela instancias específicas que puedan ser concebidas como insultos o humillaciones que violen los derechos constitucionales, según alegó la recurrida en su demanda. Tan sólo el testimonio de uno de los testigos de la demandante revela que en varias ocasiones el Sr. Rolando Cardona se refería a la señora Segarra Hernández en conversaciones *privadas* como "la gordita". Aunque esta expresión, unida a otros hechos, podría constituir un patrón de humillaciones que violen el derecho a la intimidad

de un empleado, en el caso de autos la prueba revela que tal actuación constituyó meramente una conducta poco profesional y moralmente censurable de Cardona sin que necesariamente haya transgredido los límites constitucionalmente protegidos.

Evidentemente, de la prueba se desprende que existía algún grado de tensión entre las partes. No obstante, la transcripción de la declaración de Segarra Hernández no revela un cuadro de hostilidad y denigración hacia ésta. Por ejemplo, a preguntas de los abogados sobre su relación con uno de sus supervisores, el Sr. Ismael Rodríguez, la señora Segarra declaró lo siguiente:

> P. ... ¿En este momento, cómo es su relación con el señor Ismael Rodríguez, para marzo de 1988?
> R. Bueno, el señor Rodríguez siempre tiene un[a] sonrisa en su ... cara, ....
> P. Su relación con él, ¿cómo era? Usted me indicó al principio que era buena. ....
> R. Bueno ... como yo dije también al principio, yo con todo el mundo me llevo bien. Yo me sentía un poco incómoda. Claro, pero estaba haciendo mi trabajo y lo hacía con el empeño pa[ra] demostrarle a él que de esto yo sabía y que yo iba a poder hacer el trabajo y salir adelante, y así lo indica el memo de abril. T.E., pág. 127.

Un mero sentimiento de incomodidad en el empleo por alguna situación laboral no configura una violación del derecho a la intimidad imputable al patrono. Por ello, no podemos refrendar la determinación a la cual llegó el foro de instancia.

Segarra Hernández aduce que sus supervisores la hostigaron debido a que ella descubrió ciertas irregularidades cometidas por éstos en el Royal Bank. Notamos, sin embargo, que la prueba contradice esta aseveración, ya que tales irregularidades fueron conocidas e informadas por la demandante luego de su traslado del Departamento de Cobros (1ro de noviembre de 1988). Asimismo, surge de la prueba documental que el Royal Bank investigó sus alegaciones y determinó que aunque ciertamente el Sr. Ismael

Rodríguez había cometido ciertas irregularidades administrativas, la gravedad de ellas tan sólo ameritaban una amonestación escrita. Véase *Exhibit* Conjunto Núm. XIV.

En vista de todo lo anterior, resolvemos que no se ha configurado la causa de acción alegada por Segarra Hernández y que, por lo tanto, erró el tribunal de instancia al determinar que, con sus actuaciones, el Royal Bank lesionó sus derechos constitucionales a la intimidad y a la protección contra ataques abusivos a su honra y reputación. En este contexto, las determinaciones de hecho que al respecto realizó ese foro no encuentran apoyo en la prueba y son claramente irrazonables.

Antes de concluir, debemos aclarar un aspecto. Es de esperar que, como norma general, el traslado de un empleado de un puesto a otro de menor jerarquía origine fricciones entre quienes toman la decisión del traslado y el empleado reubicado. Desde la perspectiva del obrero transferido, tal actuación, de ordinario, será vista como una actuación ofensiva. Sin embargo, esta percepción individual no necesariamente configura una lesión al derecho a la intimidad o un ataque abusivo a la honra y reputación personal que sea indemnizable según nuestro ordenamiento jurídico.

No negamos la posibilidad de que un patrón de traslados y comunicaciones internas en el escenario de trabajo, en los casos apropiados, podría ser constitutivo de un clima de hostigamiento y persecución que pudiera violar el derecho a la intimidad de un obrero y, por consiguiente, podría generar en el patrono la obligación de resarcir los daños y perjuicios causados de forma independiente a cualquier otro tipo de remedio que las leyes protectoras del trabajo le confieran al obrero. Para ello, sin embargo, el reclamante tiene que demostrar que las actuaciones del patrono son ajenas al desempeño normal en el escenario de trabajo y que son constitutivas de ataques nocivos a su dignidad e integridad personal o familiar.

 Meros traslados de posiciones o el envío de memorandos, en los cuales se evalúe la labor realizada, no configuran por sí solos una violación a la protección constitucional a la intimidad. Es preciso que tales traslados o comunicaciones internas sean arbitrarias, irrazonables y caprichosas; que generen una atmósfera hostil para el obrero que impida del todo su sana estadía en el trabajo; que sean originadas por un motivo ajeno al legítimo interés de salvaguardar el efectivo desempeño en el empleo, o que contengan expresiones claramente difamatorias o lesivas. En esta determinación los tribunales de instancia deben examinar la prueba que al respecto presente un empleado para determinar si queda configurada la violación constitucional alegada o si las actuaciones señaladas como tales por el obrero constituyen meramente gestiones administrativas legítimas.

Estimamos que en el caso de autos es esta la situación. Si bien la señora Segarra Hernández desarrolló una condición incapacitante como consecuencia de su empleo, por la cual fue tratada por el Fondo del Seguro del Estado, no consideramos que las actuaciones patronales que describe en su reclamación lesionaran sus derechos constitucionales a la intimidad y a la protección contra ataques abusivos a su honra y reputación personal. Erró el foro de instancia al decidir de otro modo.

## VI

Resta por considerar la determinación de temeridad que hiciera el magistrado de instancia.

 Los asuntos planteados en el caso de autos constituyen claramente asuntos noveles de derecho. La posible exclusividad de los diversos remedios que nuestro ordenamiento provee en la esfera laboral, con las particularidades que presenta el caso de autos, nunca antes había sido considerada por este Foro. La litigación de un caso bajo estas

circunstancias no es constitutiva de temeridad. *Elba A.B.M. v. U.P.R.*, 125 D.P.R. 294 (1990); *Santos Bermúdez v. Texaco P.R., Inc.*, 123 D.P.R. 351 (1989); *M. Quilichini Sucrs., Inc. v. Villa Inv. Corp.*, 112 D.P.R. 322 (1982); *Morales Garay v. Roldán Coss*, 110 D.P.R. 701 (1981); *Rodríguez v. John Hancock Mutual Life*, 110 D.P.R. 1 (1980).

Por lo anterior, *resolvemos que incidió el foro de instancia al resolver que las codemandadas —Royal Bank de Puerto Rico y Royal Bank de Canadá— fueron temerarias al litigar la demanda instada en su contra.*

*Se emitirá la sentencia revocatoria correspondiente.*

El Juez Asociado Señor Negrón García emitió una opinión disidente. El Juez Asociado Señor Fuster Berlingeri disintió sin opinión escrita. El Juez Asociado Señor Rebollo López no interviene. El Juez Asociado Señor Corrada Del Río se inhibió.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

Distinto a la conclusión mayoritaria, estamos ante el *despido constructivo* (injustificado) de Norma Segarra Hernández, como producto de un patrón concertado de traslados internos, persecución y hostigamiento por parte de cierto personal gerencial del Royal Bank de Puerto Rico. Éste fue como represalias por haber detectado e informado unas irregularidades del Vicepresidente Ismael Rodríguez, quien autorizó y concedió indebidamente varios préstamos a un pariente, excediendo su margen prestatario.

La prueba testifical y documental, según aquilatada por la ilustrada sala de instancia (Hon. Melvin A. Padilla Feliciano, Juez), derrota la defensa de las demandadas —Royal Bank de Puerto Rico, Royal Bank of Canada y su aseguradora Antilles Insurace Company— en cuanto a que la

labor de Segarra Hernández fue deficiente y ameritaba ser relevada de su puesto en el Departamento de Cobros; luego de la disminución de sus responsabilidades y eventual despido, de no haber ella cesado por razones de salud. Expongámosla.

## I

Segarra Hernández, con experiencia previa de veinticuatro (24) años en el Departamento de Cobros del Banco de Ponce, ciudad de Ponce, recibió en abril de 1987 una oferta de Jimmy Sotomayor, Vicepresidente Ejecutivo del Royal Bank, para ocupar el cargo de Gerente del Departamento de Cobros Centralizado. *Conocía sus atributos de honestidad, laboriosidad y adaptabilidad a cualquier ambiente de trabajo.*

Después de varias reuniones, Segarra Hernández aceptó los términos comunicádoles por el entonces Vicepresidente del Royal Bank, Ismael Rodríguez. Al llegar al banco, se confrontó con la situación de que se le requirió que firmara *un contrato probatorio de servicios,* aun cuando ello no había sido objeto de negociación previa. Optó por firmarlo, y el 1ro de junio de 1987 comenzó con un sueldo anual de veinticuatro mil quinientos dólares ($24,500).

El período probatorio se extendió hasta el 1ro de septiembre. Al finalizar, Segarra Hernández recibió una evaluación favorable ("bueno") de Rodríguez en las áreas de responsabilidad, actitudes, precisión, habilidad para conocer los procedimientos, alerta mental, capacidad, relación con los clientes, iniciativa, juicio y capacidad organizativa. En apariencia personal recibió "muy bueno" y sólo en las áreas de juicio y organización recibió una calificación de necesidad de mejoramiento (*improvement required*). En virtud de esta evaluación, Rodríguez recomendó su permanencia.

Entre el 18 y el 25 de agosto, la División de Auditoría del Royal Bank evaluó el Departamento de Cobros. Esta auditoría cubrió desde el 25 de noviembre de 1985 hasta el 18 de agosto de 1987, esto es, un (1) año y nueve (9) meses. *Como Segarra Hernández había comenzado el 1ro de junio de 1987 (dos meses y medio (2½) antes de rendirse dicho informe), las deficiencias encontradas lógicamente eran atribuibles al Gerente anterior, Rolando Cardona, quien estuvo encargado de dicho Departamento por casi todo el período auditado.* Aun así, para finales de agosto, sin otra posible justificación, fue relevada de su responsabilidad de supervisar la sección de Cobro Legal, que consistía de los casos declarados pérdidas y referidos a un abogado.

El 25 de septiembre, Cardona, *entonces ayudante de Rodríguez*, le envió un memorando en el cual expuso un aumento en los préstamos en delincuencia. Ella le comunicó su objeción a Rodríguez y aclaró que dicho aumento estaba íntimamente relacionado con deficiencias en los orígenes de los préstamos; esto es, consecuencia directa de una mala concesión en ellos. Además, en varias ocasiones hizo constar las deficiencias de equipo y otros extremos en el Departamento de Cobros y los inconvenientes que tenía para desempeñar mejor sus funciones.(¹)

El 8 de febrero de *1988*, Rodríguez la evaluó y adjudicó una puntuación de 3.65 en una escala de 1 a 7. El banco redondeó esa evaluación a 4, que es lo que se espera de cada empleado. Dos (2) meses después (en abril), Rodríguez y su supervisor Fernando Urrego *decidieron separarla del Departamento de Cobros.* Urrego le informó que *el cambio era recomendación de Rodríguez.* Fue *reubicada* en el Departamento de Automóviles y, desde ese momento, le negaron acceso a los expedientes relacionados con los préstamos y las pérdidas. Ella objetó esa reubicación. Planteó

---

(¹) El Tribunal de Primera Instancia dio absoluta credibilidad al testimonio de Jimmy Sotomayor, Vicepresidente Ejecutivo de la Banca de Consumo, de que durante su incumbencia Segarra Hernández realizó un trabajo de excelencia de acuerdo con las condiciones de trabajo existentes y los escasos recursos.

que no estaba capacitada para realizar las funciones asig-
nádales, las cuales exigían que visitara los comerciantes
que venden automóviles para promover que éstos coloca-
ran los préstamos de financiamiento con el Royal Bank.
Aclaró que toda su experiencia era en cobros —para lo cual
había sido contratada— no sabía ni tenía licencia de con-
ducir automóviles ni conocía el área metropolitana de San
Juan.

William Natal Fuster, Director del referido Departa-
mento de Automóviles, fue informado del traslado. En va-
rias ocasiones señaló que Segarra Hernández no era la per-
sona más idónea para trabajar allí, debido a que no sabía
ni estaba autorizada a conducir un automóvil. Rodríguez le
contestaba que bregara con ella como pudiera. Natal Fus-
ter testificó que ella siempre demostró buena disposición y
que, a pesar de las condiciones de trabajo, *realizó uno de
excelencia. Sin embargo, debido a todas las circunstancias,
la observó en ocasiones nerviosa, descontrolada y ansiosa.*
Cuando Rodríguez le preguntaba a Natal cómo estaba fun-
cionando Segarra Hernández, se refería a ella como "la
gordita". A Natal Fuster le extrañó esa actitud y la consi-
deró de mal gusto: una falta de respeto a la integridad y
honra de Segarra Hernández.

Dos (2) meses después (el 19 de mayo) Rodríguez envió
un memorando a Urrego para solicitar la *destitución* de
Segarra Hernández. Recomendó a su ayudante Cardona
—persona de su confianza— para sustituirla como Gerente
del Departamento de Cobros, con el título de Vicepresi-
dente Auxiliar. *Curiosamente esta recomendación fue he-
cha aun cuando Cardona era el responsable de las deficien-
cias pasadas* que habían sido señaladas en el informe de
auditoría del Departamento de Cobros, *antes de que co-
menzara a trabajar allí Segarra Hernández.* La recomen-
dación de Rodríguez se hizo al mes de habérsele reubicado,
supuestamente de forma temporera, en el Departamento
de Automóviles.

Allí, Segarra Hernández continuó con el título de Gerente de Cobros, aun cuando estaba asignada al Departamento de Automóviles. A pesar de no estar en el Departamento de Cobros, el Royal Bank *expidió verificaciones de empleo falsas*, cuando el 15 de junio y el 23 de agosto de 1988 certificó que era su Gerente. En realidad, ella realizaba en el Departamento de Automóviles gestiones oficinescas, no relacionadas con cobros. De hecho, le negaron documentos a los cuales tenía derecho a acceso como Gerente de Cobros, tales como las cantidades de pérdida para 1988.

No obstante los serios inconvenientes que enfrentó —ocasionados por las irregularidades que descubrió y la campaña personalista en su contra de Rodríguez y Cardona para encubrirlas— Segarra Hernández obtuvo resultados y mejoras en la fase administrativa.

Del Departamento de Automóviles fue reubicada, *por segunda vez*, al Departamento de Crédito Rotativo bajo la supervisión de Nitza Garland. Se le suministró un mandato, sin título, que supuestamente describía sus labores en el nuevo puesto. Debía firmarlo como prueba de su consentimiento a la reubicación. Aida Roig, funcionaria del Departamento de Recursos Humanos, la instruyó de que no lo firmara si no estaba de acuerdo. Permaneció en dicho Departamento de Crédito Rotativo por cinco (5) meses.

En septiembre de 1988, en reunión con Gloria Fuxá, Gerente de Recursos Humanos, Segarra Hernández le informó las irregularidades que había descubierto antes, cometidas por Rodríguez. *Se quejó de que había incurrido en el error de comunicárselas al propio Rodríguez, como supervisor inmediato, sin saber en ese momento que estaba implicado en éstas. Le contó también la campaña de hostigamiento y persecución de que era víctima.*

En noviembre de 1988, Segarra Hernández fue evaluada de nuevo y se le concedió una puntuación que cumplía las expectativas del banco. En esa ocasión, ella objetó

y, en el propio documento, consignó que su evaluación estaba fundamentada en "mentiras y trucos dirigidos a encubrir irregularidades cometidas por mis superiores". Rodríguez, Urrego y Cardona hicieron caso omiso a tales objeciones.

Segarra Hernández experimentó sufrimientos emocionales y desarrolló una condición nerviosa, por lo cual se ausentó del banco el 13 de marzo de 1989. Acudió entonces al Fondo del Seguro del Estado, el cual determinó una incapacidad relacionada con los sufrimientos experimentados a causa del trato que recibió de los oficiales aludidos del banco. No volvió al banco ni solicitó su reinstalación. Rodríguez eventualmente fue reprendido por las irregularidades cometidas y al tiempo cesó de trabajar con el Royal Bank.

## II

Reiteramos que estamos ante un *despido constructivo, injustificado*, que de su faz encaja perfectamente en la visión de la Asamblea Legislativa; esto es, "la *renuncia* del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra". Art. 5 de la Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185e). El trasfondo fáctico expuesto ciertamente da derecho a Segarra Hernández a una indemnización al amparo de la Ley de Mesada —Ley Núm. 80 de 30 de mayo de 1976 (29 L.P.R.A. sec. 185a *et seq.*)—; aunque no renunció formalmente, se ausentó de su trabajo a causa de la conducta de sus supervisores.

Sin embargo, la opinión mayoritaria sostiene que no procede esa compensación, pues el despido no fue injustificado. Se ampara en la tesis de que Segarra Her-

nández no solicitó su reinstalación dentro del período de doce (12) meses del "accidente" y de haber acudido a tratamiento con el Fondo del Seguro del Estado. Invoca el caso *Alvira v. SK & F Laboratories Co.*, 142 D.P.R. 803 (1997).

En ese ambiente de hostilidad, traslados y demás vejámenes, ¿cómo puede la mayoría del Tribunal imponerle la obligación de regresar a semejante ambiente? Solicitar reinstalación, ¿a cuál puesto? No estamos ante el accidente típico u ordinario de una herida o lesión física, sino uno de naturaleza intangible que trasciende lo físico e impacta lo emocional, moral y espiritual.

En estas circunstancias, exigirle a Segarra Hernández el deber de solicitar una *reinstalación* es una imposición *sumamente* gravosa, *sobre todo injusta*; máxime cuando su ausentismo se debe a un estado físico y emocional resultado directo del trato injusto y hostigante de sus supervisores. Es absurdo permitirle a los patronos incurrir en un hostigamiento tan intenso que obligue a un empleado a ausentarse por más de doce (12) meses, para luego éstos alegar inmunidad y estado de salud como defensa.

En el caso de autos se activa la doctrina expuesta en *Rivera v. Security Nat. Life Ins. Co.*, 106 D.P.R. 517, 527 (1977), reiterada en *Porto y Siurano v. Bentley P.R., Inc.*, 132 D.P.R. 331 (1992); *Alvira v. SK & F Laboratories Co.*, supra. Por excepción, se crea una causa de acción de daños y perjuicios. Rodríguez, con conocimiento de otros oficiales, es partícipe de una conducta torticera en que incurrió por otros motivos que no fueron la mera violación de una ley del trabajo. *Rivera v. Security Nat. Life Ins. Co.*, supra, pág. 527.

Precisamente, la intensidad de la conducta ilegítima y de los agravios y su manifiesta *intencionalidad* (acciones generales concertadas; ejecutadas durante varios meses), descarta también aplicar el *remedio exclusivo e inmunidad*

*patronal*, resultante de haberse sometido a tratamientos y recibido compensación del Fondo del Seguro del Estado. Compárese *Odriozola v. S. Cosmetic Dist. Corp.*, 116 D.P.R. 485 (1985).