Vivoni del Valle, Juez Ponente
*1216 TEXTO COMPLETO DE LA SENTENCIA
Acude ante nos la Srta. Edith Torres, mediante recurso de apelación, inconforme con la sentencia emitida por el Tribunal de Primera Instancia, el 30 de marzo de 2004. Mediante dicha sentencia, el tribunal declaró no ha lugar la demanda presentada por la señorita Torres.
Por los fundamentos que expondremos a continuación, confirmamos la sentencia apelada. En primer lugar, veamos los hechos según surgen de la sentencia apelada.
I
La Srta. Edith Torres comenzó a trabajar a tiempo parcial el 5 de septiembre de 1992 en la tienda de Spec’s en Ponce. La entrevistó la Sra. Diana De los Santos, en aquel momento Directora de Distrito para Spec’s y Gerente de la tienda ubicada en Plaza Las Américas en San Juan. Para el tiempo en que la señorita Torres comenzó a trabajar en Spec’s, el Sr. Juan Ayala era Asistente de Piso o “key holder” en la tienda de Spec’s en Ponce y desarrolló con ella una buena amistad.
Al año siguiente, el señor Ayala renunció y la señorita Torres solicitó el traslado a la tienda ubicada en Plaza Las Américas, en San Juan. Después de trabajar un tiempo en la tienda de Plaza Las Américas, la señorita Torres fue nombrada Asistente de Piso o “key holder”, a tiempo completo.
Posteriormente, el señor Ayala solicitó reempleo a Spec’s y fue ubicado en la tienda de Plaza Las Américas como Gerente en Adiestramiento o “manager-in-training”. Es entonces que el señor Ayala y la señorita Torres reanudan su previa amistad y se envuelven en una relación amorosa consensual. 
Surge de la determinación de hechos de la sentencia apelada que en el período de aproximadamente seis meses que duró la relación amorosa, el señor Ayala no tenía autoridad sobre la señorita Torres. El romance entre la señorita Torres y el señor Ayala tampoco era de conocimiento público en la tienda donde éstos trabajaban. No obstante, la señorita Torres informó a la señora Diana De los Santos de su relación con el señor Ayala. La señora De los Santos le recalcó a la señorita Torres la política pública de la tienda y le indicó que no podrían tener contacto dentro de la tienda, ya que estaban en el mismo ambiente de trabajo y no quería que crearan problemas. A los seis meses de la relación, el señor Ayala rompió con la señorita Torres y ésta quedó emocionalmente afectada. Así, pues, el señor Ayala solicitó traslado a la tienda de Spec’s en Montehiedra. A su vez, la señorita Torres le informó a la señora De los Santos del final de la relación entre ellos.
Posteriormente, en 1996, la tienda de Spec’s en Plaza Las Américas estuvo sin Gerente varios meses. Por *1217 tal razón, la señora Diana De los Santos trasladó al señor Ayala a la tienda en Plaza Las Américas, para que ocupara el puesto de Gerente. De igual forma promovió a la señorita Torres a Asistente de Gerente. 
En algún momento luego que el señor Ayala regresara a la tienda Spec’s en Plaza Las Américas, éste le pidió a la señorita Torres que reanudaran sus relaciones amorosas. Acto seguido, la señorita Torres lo rechazó y le pidió que no insistiera. Es importante mencionar que el rechazo no tuvo efecto negativo en el progreso laboral de la señorita Torres. De hecho, las evaluaciones efectuadas en 1998 y 1999 por el señor Ayala fueron inclusive superiores a las efectuadas por la señora De los Santos en años anteriores. Después del acercamiento antes mencionado, no hubo ningún otro comentario de índole sexual. Surge de los escritos que sólo hubo unos halagos tales como “te ves bonita hoy”, y en ocasiones le compraba el almuerzo. Además subrayamos que, a pesar de la confianza que la señorita Torres tenía con la señora De los Santos, cuando el señor Ayala fue promovido a Supervisor del área de Puerto Rico, Torres no se quejó de que el señor Ayala la estuviera hostigando sexualmente. Sin embargo, la señorita Torres acusó en una ocasión al señor Ayala de apropiarse de un equipo Sony que era para una promoción.
Posteriormente, Trans World Entertainment adquirió las acciones de la corporación propietaria de Spec's. Durante el proceso de transición y de evaluación de las operaciones, el señor Ayala evaluó a la señorita Torres en mayo de 1999 y la promovió a Gerente de la tienda de Plaza Las Américas. De la evaluación hecha a la señorita Torres, surgía que el área deficiente lo era el área de operaciones y control de pérdidas. El señor Ayala le fijó varias metas, entre otras, el enfocar más su atención a la observación del desempeño de los asociados en el piso de ventas, y trabajar en una agenda diaria y semanal de tareas de limpieza, asunto importante para la apariencia de la tienda.
No obstante lo anterior, en el mes de junio 1999, la señorita Torres emprendió una serie de acciones que ameritaron acción correctiva por escrito. La primera fue recibida el 25 de junio de 1999 por el señor Ayala, que en esos momentos era el Gerente de la tienda y el Gerente de Distrito, debido a que la señorita Torres había tomado $20.00 de la caja fuerte para propósitos personales. La señorita Torres se disculpó con él y explicó que se le había olvidado devolver el dinero que había tomado para almorzar. El señor Ayala le dio una oportunidad a la señorita Torres, ya que las reglas y reglamentos de la compañía sancionan el tomar dinero y utilizarlo como propio con pena de despido inmediato.
Días después, el señor Ayala le dio dos amonestaciones adicionales a la señorita Torres. Estas se debieron a dos incidentes de falta de respeto de la señorita Torres. El señor Ayala le indicó que era necesario mantener el ambiente de trabajo libre de actos irrespetuosos. A pesar de los incidentes antes mencionados, el señor Ayala retuvo en su puesto a la señorita Torres y ésta empezó como Gerente en propiedad el 8 de agosto de 1999.
Conviene destacar que uno de los requisitos de la plaza de Gerente es que se encuentre en la tienda por lo menos cuarenta y cuatro (44) horas a la semana. Por lo antes mencionado, el señor Ayala apercibió a la señorita Torres que no estaba trabajando las horas semanales requeridas y que eso era un requisito de su posición como Gerente. Además, le informó que no estaba cumpliendo con la implementación del “planificador de período de mercadeo mensual”, que era una prioridad principal de la gerencia.
Para el mes de febrero de 2000, varios ejecutivos de Trans World tuvieron que visitar 1a* tienda de Spec’s, pues descubrieron, a través de los sistemas computarizados, que habían números muy altos de reducción de inventario. A raíz de ello, la señorita Torres argumentó que se había percatado de ello, que se lo comentó al señor Ayala, pero que no hizo nada al respecto. A pesar de los incidentes antes mencionados, la señorita* Torres recibió un bono de más de doce mil dólares ($12,000.00) como premio a las ventas de la tienda en el período de 1999-2000, y una carta felicitándola por su logro.
Así las cosas, el 22 de marzo de 2000, la señorita Torres, recibió un plan de mejoramiento de treinta (30) *1218 días para controlar las pérdidas de inventario identificadas en el mes anterior. Al evaluar el plan de mejoramiento, que refleja una serie de deficiencias observadas, la ejecutiva de la oficina central de Trans World, la Sra. Judy Satín, determinó que la señorita Torres sólo corrigió cuatro de los ocho aspectos identificados para mejoramiento.
El 15 de mayo de 2000, el señor Ayala se reunió con la señorita Torres para discutir su desempeño en los primeros seis meses que estuvo de Gerente y la evaluación de su trabajo. A base de las deficiencias señaladas en la evaluación de sus primeros seis meses, Trans World le ofreció a la señorita Torres un plan de desarrollo individual, el cual era opcional, y recibiría la oportunidad de mejorar su desempeño en treinta (30) días. Sin embargo, se le especificó que de no mejorar en esos treinta (30) días, podría ser despedida sumariamente. Luego de la reunión con el señor Ayala, la señorita Torres solicitó irse a su casa para hablar con su padre antes de tomar una decisión. No obstante, regresó a dejar su carta de renuncia, efectiva el 16 de mayo de 2000. 
Consiguientemente, el 27 de abril de 2001, la Srta. Edith Torres presentó la demanda que da génesis a la controversia de marras, alegando, en síntesis, que fue víctima de hostigamiento sexual por parte del gerente de la tienda Spec’s propiedad de Trans World, el señor Ayala. Además, argüyó que se vio obligada a renunciar como resultado de la presión recibida por su rechazo a los acercamientos sexuales del señor Ayala. La demanda fue instada al amparo de la Ley de Despido Injustificado, Ley 80 de 30 de mayo de 1976, 29 L.P.R.A. see. 185 et. seq.] Ley 17 de 22 de abril de 1998, 29 L.P.R.A. see. 155 et seq.] y la Ley 2 de 17 de octubre de 1961, 32 L.P.R.A. sec. 3118 et seq.
Señalada la vista en su fondo, el 14 de enero de 2004, comparecieron las partes, testificó la señorita Torres y admitió haber recibido copia escrita y conocer las políticas de hostigamiento sexual establecidas por Trans World. Luego de sometidos los memorandos de las partes, el 30 de marzo de 2004, el tribunal apelado emitió determinaciones de hechos, conclusiones de derecho y dictó sentencia declarando no ha lugar la demanda en su totalidad.
Inconforme con la sentencia del 30 de marzo de 2004, notificada el 21 de abril de 2004, la señorita Torres presentó un escrito de apelación señalando la comisión de los siguientes errores:

“Erró el Tribunal de Primera Instancia al determinar que la demandante no presentó prueba prima facie suficiente para activar la presunción de discrimen establecida por la Ley 17, y que la prueba que presentó subsiguientemente no fue suficiente para establecer que hubo hostigamiento sexual.

Erró el Tribunal de Primera Instancia al no aplicar los requisitos establecidos por la Ley 17 con relación a la prueba requerida para controvertir la presunción de hostigamiento en el empleo. ”

II
Sabido es que la Constitución del Estado Libre Asociado de Puerto Rico, Art. II, Sec. I, prohíbe expresamente el establecimiento de discrimen alguno por razón de raza, color, sexo, nacimiento, origen o condición social, ideas políticas o religiosas. A su vez, la See. 8 del Art. II de nuestra Constitución consagra un principio de comparable reconocimiento, el cual le reconoce a toda persona una protección de elevado rango contra todo ataque abusivo a su honra, reputación y vida privada o familiar. Figueroa Ferrer v. E.L.A., 107 D.P.R. 250 (1978).
Del mismo modo, la Asamblea Legislativa ha aprobado leyes para prohibir el discrimen y el hostigamiento sexual en el empleo y para implementar el derecho de los trabajadores a organizarse colectivamente. Véase, Ley 100 de 30 de junio de 1959, según enmendada, 29 L.P.R.A. see. 146 et seq.] Ley 17 de 22 de abril de 1988, 29 L.P.R.A. see. 155 et seq.] y Ley de Relaciones del Trabajo de Puerto Rico, Ley 130 de 8 de Mayo de 1945, 29 L.P.R.A. sec. 61 et seq. Además, el trabajador puertorriqueño tiene la protección de la Ley 80 de 1976, supra, la *1219 cual penaliza el despido injustificado.
Los estatutos antes mencionados forman parte de un ordenamiento integral diseñado por la Asamblea Legislativa para dar vigencia, dentro del contexto de las relaciones obrero-patronales, a los valores sobre los cuales se erige nuestra sociedad democrática. Ortiz y otros v. Municipio de Lajas, Opinión del 30 de marzo de 2001, 153 D.P.R. _ (2001), 2001 J.T.S. 51. Así, pues, ejemplifican parte de la política pública constitucional que instituyó la Asamblea Legislativa para proveer a la clase trabajadora remedios prácticos administrativos y judiciales cuando el patrono incumple con sus obligaciones estatutarias y las impuestas por la Constitución del Estado Libre Asociado de Puerto Rico para “reparar a las víctimas de los daños causados por el discrimen en el empleo”. S.L.G. v. Roger Elecrtic Co., Inc., Opinión de 26 de abril de 2002, 156 D.P.R. _ (2002), 2002 J.T.S. 62.
Estos preceptos rigen el ámbito obrero-patronal y están instrumentados en la Ley 100, ante, la cual prohíbe, de manera general, el discrimen en el empleo. S.L.G. v. Roger Elecrtic Co., Inc., supra; Rodríguez Meléndez v. Sup. Amigo, Inc., 126 D.P.R. 117 (1990). En su Art. 3, establece una presunción controvertible de discrimen en el empleo, cuando el despido no es por justa causa. Suárez Ruiz v. Figueroa Colón, 145 D.P.R. 142 (1998). Sin embargo, la Ley 100 no contiene una definición de justa causa para despido, por lo cual hay que recurrir a las disposiciones de justa causa de la Ley 80, ante, y su jurisprudencia interpretativa. Soto v. Hotel Caribe Hilton, 137 D.P.R. 294 (1994). En síntesis, la Ley 100 establece una presunción rebatible de que el despido es discriminatorio. Adviértase, sin embargo, que la presunción de despido discriminatorio que establece la Ley 100 sólo se activa en la vista evidenciaría del caso, no antes. S.L.G. Hernández-Beltrán v. TOLIC, 151 D.P.R. 755, 11A (2000).
Al amparo del Art. 3 de la Ley 100, ante, el esquema procesal con respecto a la presentación de la prueba es el siguiente. El peso de la prueba para establecer las bases de su reclamación le continúa correspondiendo inicialmente al empleado. Este tiene que comenzar presentando prueba que demuestre, primero, que hubo un despido o acto perjudicial; segundo, que éste se realizó sin justa causa; y tercero, algún hecho base que lo ubique dentro de la modalidad de discrimen bajo la cual reclama. Una vez el empleado cumple con esta primera fase, surge la presunción de discrimen del Art. 3. Es decir, el empleado no tiene que probar el acto discriminatorio que es objeto de la presunción. S.L.G. Hernández-Beltrán v. TOLIC, supra.
El peso de la prueba cambia, y recae entonces sobre el patrono. Si el patrono no presenta prueba alguna en esta etapa, se considera que el empleado ha probado su caso de discrimen restando sólo la presentación de la prueba sobre los daños. De otra parte, si el patrono decide defenderse, tiene varias alternativas. Éste puede presentar prueba que rebata la presunción de discrimen activada por el empleado; o puede optar por presentar prueba de que el despido fue justificado; o que no hubo tal despido; o que a pesar de haber habido un despido injustificado, éste no fue discriminatorio. Una vez el patrono presenta su prueba rebatiendo la presunción de discrimen del Art. 3, el empleado todavía tiene otra oportunidad. Puede presentar evidencia para probar su caso; o sea, probar que realmente hubo un despido discriminatorio, pero esta vez lo tendrá que hacer sin el beneficio de la presunción. Tendrá que presentar evidencia de incidentes o hechos que prueben dicho discrimen o de los cuales se pueda inferir la alegada actuación discriminatoria. S.L.G. Hernández-Beltrán v. TOLIC, supra.
Los efectos del esquema probatorio establecidos por el Art. 3 son con respecto a la presentación de la prueba en la vista en su fondo que se celebre en el Tribunal de Primera Instancia, no con relación a la mera presentación de las alegaciones. En otras palabras, para activar la presunción de discrimen, el empleado demandante tiene que probar tres (3) elementos: (1) que hubo un despido o acción perjudicial; (2) que éste se realizó sin justa causa; y (3) el empleado tiene que presentar evidencia indicativa de la modalidad de discrimen que se vincula a su despido. En ese momento es que se activa la presunción. S.L.G. Hernández-Beltrán v. TOLIC, supra.
*1220 Nuestro Tribunal Supremo ha dispuesto que las consecuencias del incumplimiento por parte del patrono de estas leyes laborales y las respectivas disposiciones constitucionales, varían de caso a caso dependiendo de lo provisto por la Asamblea Legislativa y de la naturaleza de la garantía constitucional de la que se trate. A saber, mediante la aprobación de la Ley 80, ante, se le brinda a los trabajadores que han sido despedidos sin justa causa, la oportunidad de disfrutar de una indemnización que les permita suplir sus necesidades básicas durante el tiempo que les pueda tomar conseguir un nuevo empleo. Díaz v. Wyndham Hotel Corp., Opinión de 24 de octubre de 2001, 155 D.P.R. _ (2001); 2001 J.T.S. 146. La referida Ley dispone al menos tres situaciones concebibles como un despido: (i) la cesantía del empleado, (2) la suspensión indefinida que se prolongue por un período mayor de tres meses, y (3) una renuncia del empleado motivada por actuaciones del patrono, tales como la imposición de condiciones onerosas. S.L.G. Hernández-Beltrán v. TOLIC, supra; S.L.G. v. Royal Bank de P. R., 145 D.P.R. 178 (1998). Del mismo modo, el obrero contratado sin término fijo que es despido sin justa causa tiene derecho al remedio de la mesada que provee la Ley 80, supra. García Benavente v. Aljoma Lumber, Inc., Opinión de 21 de julio de 2004, 162 D.P.R. _ (2004), 2004 J.T.S. 131; Díaz v. Wyndham Hotel Corp., supra.
Ahora bien, la exclusividad del remedio provisto en la Ley 80, supra, no aplica cuando el legislador establece situaciones particulares bajo las cuales un obrero simplemente no puede ser despedido, como por ejemplo, en los casos de reclamaciones laborales que surgen por discrimen por razón de edad, sexo, color, raza, origen o condición social, ideas políticas, ideas religiosas, origen nacional y por razón de matrimonio o razón de embarazo, provistas en la Ley 100 de 30 de junio de 1959, supra, y Ley 3 de 13 de marzo de 1942, según enmendada, 29 L.P.R.A. see. 147 et seq.; por hostigamiento sexual en el empleo, Ley 17 de 22 de abril de 1988, supra; entre otras. Véase además, Díaz Fontánez v. Wyndham Hotel Corp., supra; Vélez Rodríguez v. Pueblo Int'l, Inc., 135 D.P.R. 500, 511-513. En estos casos, los remedios incluyen la reinstalación al empleo, los salarios dejados de percibir y, como norma general, los daños que el despido ocasionó, además de, en ciertas ocasiones, otra suma igual por concepto de penalidad. Delgado Zayas, Apuntes para el Estudio de la Legislación Protectoría del Trabajo en el Derecho Laboral, 2001, pág 115; García Benavente v. Aljoma Lumber, Inc., Opinión de 21 de julio de 2004, 162 D.P.R. _ (2004), 2004 J.T.S. 131.
Huelga mencionar que el despido constructivo, recogido en el Art. 5 de la Ley 80, constituye una modalidad del despido sin justa causa. Dicho precepto establece en lo pertinente:
“...La renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar, tales como imponerle o intentar imponerle condiciones de trabajo más onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra. ” 29 L.P.R.A. sec,185e.
La jurisprudencia y las Guías Interpretativas de la Ley de Despido Injustificado de Puerto Rico, indican que un despido constructivo sólo procede cuando la persona demuestra que su patrono incurrió en actos voluntarios e injustificados encaminados a obligar al empleado a dejar su empleo y que la única alternativa razonable era la de abandonar su cargo o empleo. Arthur Young v. Virgilio Vega, 136 D.P.R. 157 (1994). A fin de que se configure el despido constructivo, se requieren los siguientes elementos básicos: (1) las acciones del patrono deben exhibir un nivel de seriedad considerables, no ser simples malentendidos o situaciones antipáticas que no tienen el efecto de crearle al empleado un ambiente de trabajo que resulte intimidante, hostil y ofensivo; y (2) el empleado no puede tener disponible otra alternativa que no sea romper el vínculo obrero-patronal para resolver la situación que enfrenta en su trabajo. Si existe otra opción que pueda resultar razonable para resolver la situación que enfrenta en su trabajo, entonces éste tiene una obligación de recurrir a dicha opción para intentar resolver el asunto. De lo contrario, no podrá invocar que fue víctima de un despido constructivo. Véase, Guías para la Interpretación y Aplicación de la Ley Núm. 80.
A tenor con lo anterior, es preciso que las actuaciones del patrono sean arbitrarias, irrazonables y *1221 caprichosas, que generen una atmósfera hostil para'el obrero, que impidan su sana estadía en el trabajo y que sean originadas por un motivo ajeno al legítimo interés de salvaguardar el bienestar de la empresa. No obstante, gestiones administrativas realizadas con el único propósito de salvaguardar el bienestar de la empresa, no dan lugar a un despido constmctivo si la intención del patrono al realizar las mismas no era la de lesionar la condición en el empleo del trabajador. Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178 (1998). Es por ello, que no todos los traslados, reducciones de salario o cambios de condiciones de trabajo, dan lugar a un despido constructivo. Id.
Por otro lado, ante la ausencia de una disposición que expresamente prohibiera el hostigamiento sexual en dicho contexto, la Asamblea Legislativa aprobó la Ley 17 del 22 de abril de 1988, 29 L.P.R.A. see. 155 et seq., para establecer, como política pública del Estado Libre Asociado, que el hostigamiento sexual en el empleo es una modalidad de discrimen por razón de sexo, y constituye dicha conducta una práctica asimismo ilegal, indeseable y violatoria del principio constitucional que consagra la inviolabilidad de la dignidad del ser humano. S.L.G. v. Roger Elecrtic Co., Inc., Opinión de 26 de abril de 2002, 156 D.P.R. _ (2002), 2002 J.T.S. 62; Vélez v. Serv. Legales de P.R., Inc., 144 D.P.R. 671 (1998).
El hostigamiento sexual en el empleo consiste en. cualquier tipo de acercamiento sexual no deseado, requerimiento de favores sexuales y cualquier otra conducta verbal o física de naturaleza sexual cuando se da una de las siguientes circunstancias: 1) cuando el someterse a dicha conducta, se convierte de forma implícita o explícita en un término o condición del empleo de una persona; 2) cuando el sometimiento o rechazo a dicha conducta por parte de la persona, se convierte en fundamento para la toma de decisiones en el empleo o respecto del empleo que afectan a esa persona; y 3) cuando esa conducta tiene el efecto o propósito de interferir de manera irrazonable con el desempeño del trabajo de esa persona o cuando crea un ambiente de trabajo intimidante, hostil u ofensivo. 29 L.P.R.A. see. 155.
Nuestro más alto Foro ha reconocido dos modalidades de hostigamiento sexual, a saber: el hostigamiento conocido como quid pro quo o algo a cambio de algo, y el hostigamiento sexual por ambiente hostil. Rodríguez Meléndez v. Sup. Amigo, Inc., ante. De estas dos vertientes, la primera, se configura cuando el sometimiento o rechazo de los avances o requerimientos sexuales se toma como base para afectar beneficios tangibles en el empleo. En una causa de acción interpuesta bajo esta modalidad, se requiere que el demandante pruebe la solicitud de favores de naturaleza sexual o el padecimiento de avances de igual tipo y que el sometimiento o rechazo a dicha conducta haya sido la causa de una decisión adversa en cuanto a determinada condición o beneficio de empleo. Ibid.
Por otro lado, el hostigamiento sexual por ambiente hostil envuelve conducta de naturaleza sexual por parte del hostigador la cual interfiere irrazonablemente con el desempeño del empleado en su trabajo o es lo suficientemente severa y ofensiva como para crearle al empleado que es víctima de la misma, un ambiente de trabajo que resulte intimidante, hostil y ofensivo. Señalado lo anterior, para establecer un caso prima facie bajo esta modalidad, basta con que el hostigamiento se dirija a la víctima únicamente por razón de su sexo; no es necesario que la conducta sea explícitamente sexual ni que le cause un menoscabo económico al empleado afectado. Más bien, lo determinante es que la conducta hostigante, que no puede consistir de un incidente aislado, haya causado tal grado de ansiedad y debilitamiento de la estima y confianza propias del demandante que sus condiciones de empleo se hayan contaminado impermisiblemente. S.L.G. v. Roger Elecrtic Co., Inc., supra; Rodríguez v. Sup. Amigo, ante; 29 L.P.R.A. sec. 155b(c).
III
Expuesto el trasfondo doctrinario, procedemos a analizar la controversia ante nos.
La señorita Torres argumenta que el Tribunal de Primera Instancia erró al determinar que ella no presentó prueba prima facie suficiente para activar la presunción de discrimen establecida por la Ley 17. Segundo, *1222 plantea que el Tribunal de Primera Instancia no aplicó los requisitos establecido por la Ley 17 con relación a la prueba para controvertir la presunción de hostigamiento sexual. Por estar intrínsecamente relacionados los señalamientos de error, los discutiremos en conjunto.
Debemos analizar el esquema probatorio de la Ley 18 conjuntamente con las disposiciones de la Ley 100. Así pues, los efectos son con respecto a la presentación de la prueba en la vista en su fondo que se celebre ante el Tribunal de Primera Instancia y no con relación a la mera presentación de alegaciones.
La señorita Torres señala que las actuaciones del señor Ayala constituyen hostigamiento sexual en el empleo bajo la modalidad de ambiente hostil. Por lo tanto, al evaluar dicha reclamación, debemos determinar si la alegada conducta constitutiva de hostigamiento fue lo suficientemente severa y ofensiva como para alterar las condiciones de empleo y crear un ambiente de trabajo abusivo.
De los autos surge que no hay prueba alguna que evidencie que la señorita Torres se sentía intimidada por el señor Ayala. Más bien, ésta demostraba un exceso de familiaridad hacia el señor Ayala. Debemos reiterar que las evaluaciones efectuadas en 1998 y 1999 por el señor Ayala fueron superiores a las efectuadas por la señora De los Santos en años anteriores. Más aún, es a base de la evaluación preparada por el señor Ayala en el mes de mayo de 1999, que Trans World tomó la decisión de promover a la señorita Torres a Gerente de su tienda en Plaza Las Américas.
Conviene destacar que, aunque la señorita Torres violó las reglas de la compañía al tomar dinero de la caja para uso personal, el señor Ayala no recomendó su despido. Haciendo caso omiso a la oportunidad que le brindó el señor Ayala al no despedirla, la señorita Torres comenzó a mostrar conducta poco profesional al incurrir en dos incidentes en los cuales le faltó el respeto al señor Ayala. Ante los incidentes antes mencionados, el señor Ayala tampoco detuvo el nombramiento oficial de la señorita Torres como Gerente de la tienda de Plaza Las Américas.
Como corolario de su nombramiento, la señorita Torres demostró falta de dedicación, pues no cumplía con las 44 horas requeridas. Asimismo, manifestó falta de enfoque y de conocimiento de las funciones de su posición. Si bien es cierto que la señorita Torres se encontraba bajo mucha presión en el período cubierto en su evaluación, ésta no estableció que guardase relación alguna con su rechazo a la propuesta amorosa del señor Ayala. También manifestó que se sentía confundida por la conducta voluble del señor Ayala; no obstante, tampoco estableció que su rechazo a la propuesta amorosa fue la causa del trato rudo por el señor Ayala. Más importante aún, la señorita Torres admitió que las acciones disciplinarias impuestas estaban justificadas por su desempeño deficiente en el período evaluado.
Finalmente, el tribunal apelado, conforme a la credibilidad que el testimonio de la señorita Torres mereció, determinó que no hubo ningún otro comentario de índole sexual después del 1997. Al ser así, el término prescriptivo aplicable a una acción por violación a los derechos civiles de la demandante, tal como lo es el hostigamiento sexual, es por analogía el término de un año aplicable a las acciones de daños y perjuicios. Nazario Acosta v. E.L.A., 159 D.P.R., 2003 J.T.S. 116. Maldonado v. Russe, 153 D.P.R. _; 2001 J.T.S. 17.
Resolvemos que, en ausencia de continuidad de incidentes discriminatorios relacionados con el rechazo de la propuesta del señor Ayala a la señorita Torres, el avance sexual ocurrido tres años antes de la renuncia de la señorita Torres está prescrito. Por lo tanto, es innecesario considerar si un acto aislado de tal naturaleza, sin consecuencias negativas, constituye hostigamiento sexual según configurado por la Ley y la jurispmdencia.
Es menester destacar que en su escrito de apelación, la señorita Torres argumenta que los avances de naturaleza sexual continuaron hasta su despido y que el tribunal apelado adoptó el Memorando de Hechos y Conclusiones de Derecho de la parte demandada ad verbatim, conforme a la Regla 43.3 de Procedimiento Civil, *1223 32 L.P.R.A. Ap. III, R. 43. No obstante, el rengiedio que tenía la parte, si no estaba conforme con las determinaciones iniciales, era presentar una moción diez (10) días después de haberse archivado en autos copia de la notificación de la sentencia, para que el tribunal enmendara o hiciera determinaciones adicionales, enmendando la sentencia de conformidad. Establecido, pues, la regla general es la de abstenemos de intervenir en cuanto al trasfondo fáctico, ya que el tribunal apelativo no puede alterar las conclusiones de hecho de un tribunal inferior a menos que éstas sean claramente erróneas. Sánchez v. López, 116 D.P.R. 172 (1985).
En relación con el argumento de despido constructivo, los hechos probados no sustentan que la señorita Torres se vio obligada a renunciar debido a un ambiente hostil por razón de hostigamiento sexual creado por el señor Ayala. Además, la señorita Torres conocía de forma clara la política contra el hostigamiento sexual entre sus supervisores y empleados, pues se reunió con la Sra. Diana de los Santos para mencionarle sobre su relación con el señor Ayala.
Resolvemos que la evaluación del desempeño de la señorita Torres, conforme a las expectativas de su nueva posición, fue un ejercicio legítimo del interés de salvaguardar el bienestar de la empresa. Se le brindó oportunidad de corregir su desempeño y ésta prefirió renunciar. Por lo tanto, el renunciar no era la única alternativa.
A la luz del ordenamiento jurídico reseñado, somos de opinión que el tribunal apelado no erró al determinar que el caso de autos no constituye un despido constructivo. Es forzoso concluir que la renuncia de la señorita Torres no constituye un despido constructivo como resultado de acciones injustificadas de la demandada para obligarla a renunciar.
IV
Por los fundamentos anteriormente expuestos, confirmamos la sentencia apelada.
Notifíquese de inmediato por teléfono o fax, además de por la vía ordinaria, y deberá también notificarse de inmediato al Tribunal Supremo.
Lo acordó el Tribunal y lo certifica la Secretaria del Tribunal.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2005 DTA 64
1. El señor Ayala era un joven casado, pero le había representado a la señorita Torres que estaba separado de su esposa.
2. Es menester destacar que según surgen de las determinaciones de hechos en el momento que regresa el señor Ayala a la tienda de Plaza Las Américas, la señorita Torres estaba recuperada del desengaño amoroso que sufrió con éste y no tuvo objeción en trabajar con él. Cuando regresó el señor Ayala a la tienda de Plaza Las Américas, la señorita Torres tenía un romance con otro empleado de la tienda.
3. En el primer incidente, la señorita Torres le indicó al señor Ayala que no iba a “bregar” con un carrito de mercancía que estaba desorganizado. Cuando el señor Ayala le indicó que por favor lo hiciera, la señorita Torres tiró al carrito una tableta de escribir, frente a otros empleados que se encontraban en la tienda. En la segunda ocasión, la señorita Torres le dijo al señor Ayala, frente a un grupo de asociados “ay, que estúpido eres”. La señorita Ayala se disculpó y le expresó al señor Ayala que estaba “vacilando y no esperaba que le molestaran sus palabras”.
4. La señorita Torres se manifestó de la siguiente manera en su carta de renuncia del 16 de mayo de 2000:
*1224 "With this letter I, Edith M Torres Morell present my resignation effective today May 16, 2000. I'm leaving the company because I felt forced to do so, I know that if I stay in the company I will feel in a hostile work environment and not comfortable performing my job. I worked for Spec’s Music for 7 years and 8 months and gave my very best to the company. Thanks for the opportunity to learn and grow professionally that Spec’s music gave me. ” (Enfasis nuestro.)
5. Belk v. Martínez, 146 D.P.R. 215 (1998).
6. In re: Robles Sanabria, 151 D.P.R. 483 (1994).