*651 TEXTO COMPLETO DE LA SENTENCIA
El 27 de mayo de 2005, Morovis Community Health Center, Inc. (MCHC) y el Ledo. Manuel Díaz Collazo (Ledo. Díaz Collazo) presentaron recurso de apelación en el que solicitaron la revocación de la Sentencia emitida por el Tribunal de Primera Instancia, Sala Superior de Arecibo (TPI), el 4 de abril de 2005, notificada y archivada en autos el 2 de mayo de 2005.
A continuación expondremos brevemente el trasfondo fáctico y procesal del caso.
I
El 18 de junio de 1998, Gladys Robles Burgos (Robles) presentó demanda sobre daños y perjuicios en contra de los Apelantes y otros. En ésta, señaló que trabajó para MCHC en calidad de Directora de Recursos Humanos. Según lo alegado, en el 1997, el co-demandado Ledo. Díaz Collazo, Presidente de la Junta de Directores, comenzó a presionar a Robles para que dejara sin efecto la contratación de dos (2) empleadas de MCHC. En vista de que ella se opuso a su solicitud, empezó a visitar y a llamar frecuentemente a Robles a su trabajo aprovechando en cada encuentro para amenazarla con despedirla y radicarle cargos por fraude, lo que se convirtió en una campaña de hostigamiento, amenaza, intimidación y acoso emocional en contra de ella. En otro incidente, el 21 de agosto de 1997, se llevó a cabo una reunión en la que el co-demandado Ledo. Díaz Collazo golpeó a Robles en la espalda y le dijo que permaneciera sentada cuando ella le ofreció su silla como un gesto de cortesía. A raíz de estas situaciones, Robles renunció a su puesto.
Surge de la demanda, que Robles le comunicó a la Junta de Directores de MCHC y a Víctor Alicea, Director Ejecutivo de MCHC, sobre las condiciones de intimidación, hostigamiento y violencia emocional a la que estuvo sujeta por parte del co-demandado Ledo. Díaz Collazo. Dicha situación le estaba afectando su salud y estabilidad emocional. Alegadamente, la co-demandada MCHC no inició ninguna acción correctiva y actuó negligentemente en el manejo de la situación, lo cual constituia una violación e incumplimiento de contrato y una violación a la política pública.
Robles reclamó la cantidad de nueve mil dólares ($9,000) por concepto de salarios dejado de devengar; tres mil dólares ($3,000) como compensación por los beneficios dejados de percibir; lucro cesante, quinientos mil dólares ($500,000) por los daños sufridos; honorarios de abogados, costas y gastos del litigio e intereses.
Transcurridos varios incidentes procesales interlocutorios, el 11 de septiembre de 1998, los Apelantes presentaron su contestación a la demanda. Además, instaron reconvención en la que alegaron que Robles actuó de forma negligente, culposa e irresponsable en el desempeño de sus labores, así como en violación del reglamento, las normas institucionales y las directrices de sus superiores de la Junta de Directores. Señalaron que actuó por su cuenta y en coordinación con Víctor Alicea y/o con otras personas con el interés de beneficiarse. Que sus actuaciones le causaron daños y pérdidas que ascendían a dos millones de dólares ($2,000,000) al MCHC. Cabe señalar que dicha reconvención fue desestimada por ausencia absoluta de actividad judicial.
*652 Luego de otros incidentes procesales interlocutorios, 27 de febrero de 2002, el TPI ordenó la anotación de rebeldía contra los Apelantes y la eliminación de las alegaciones.
El 14 de julio y de septiembre de 2004, el TPI celebró juicio en su fondo en rebeldía.
Posteriormente, el 4 de abril de 2005, notificada el 2 de mayo de 2005, el TPI concluyó que Robles había sido despedida de su empleo sin justa causa, por lo que ordenó el pago de la mesada equivalente a seis mil cuatrocientos cincuenta y nueve dólares ($6,459), según dispone la Ley Núm. 80 del 30 de mayo de 1976, 29 L. P.R.A. see. 185 etseq.
De otra parte, el TPI concluyó que Robles fue víctima de discrimen por razón de género y ordenó el pago de cincuenta mil dólares ($50,000) por concepto de daños, sufrimientos y angustias mentales ocasionadas. Además, dispuso que dicha partida estaba sujeta a ser duplicada al amparo de la Ley Núm. 100 de 30 de junio de de 1959, 29 L.P.R.A. see. 146 et seq., para un total de cien mil dólares ($100,000).
También, el TPI ordenó el pago de honorarios de abogados a razón de un veinticinco por ciento (25%) de la indemnización concedida al amparo de la de Ley Núm. 100, supra, para un total de doce mil quinientos dólares ($12,500). Además, ordenó el pago de cinco mil dólares ($5,000) al amparo del Artículo 1802 del Código Civil de Puerto Rico, 31 L.P.R.A. see. 5141, como indemnización por la humillación, degradación y los daños emocionales y morales resultantes de la agresión física a la cual fue sometida Robles.
II
Inconformes con el dictamen del TPI, el 27 de mayo de 2005, los Apelantes presentaron recurso de apelación en el que señalaron la comisión de los siguientes errores:

“PRIMER ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA EN LA ADMISIÓN ERRÓNEA DEL TESTIMONIO DE LA SRA. JOSEFA DÍAZ PARA JUSTIFICAR LA DETERMINACIÓN DE DISCRIMEN POR RAZÓN DE GÉNERO.

SEGUNDO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA EN LA APRECIACIÓN DE LA TOTALIDAD DE LA PRUEBA PRESENTADA, LA CUAL DE POR SI DEMUESTRA LA FALTA DE CAUSA DE ACCIÓN DE LA DEMANDANTE A BASE DE SUS PROPIAS ADMISIONES EN EL CONTRAINTERROGATORIO A QUE FUE SOMETIDA.

TERCER ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA EN LA APRECIACIÓN DE LA PRUEBA Y ESPECÍFICAMENTE AL NO HABER CONSIDERADO EL CONTRAINTERROGATORIO DE LA DEMANDANTE, QUIEN ACEPTÓ LA FALTA DE CUALQUIERA DE LAS ALEGACIONES QUE EXPUSO EN LA DEMANDA PRESENTADA.

CUARTO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL CONCEDER UN REMEDIO A LA PARTE DEMANDANTE QUE NO SE ENCUENTRA SOSTENIDO POR LA PRUEBA PRESENTADA, Y A PESAR DE LAS CLARAS ADMISIONES DE LA DEMANDANTE EN SU CONTRAINTERROGATORIO SOBRE SU FALTA DE CAUSA DE ACCIÓN EN CUANTO A LA VIOLACIÓN A SU DERECHO ALA INTIMIDAD.

QUINTO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO EVALUAR LOS TESTIMONIOS DE LA DEMANDANTE Y DEL TESTIGO VALERIANO RIVERA GONZÁLEZ QUIENES SE IMPUGNARON ENTRE SI EN CUANTO AL ALEGADO INCIDENTE SOBRE LA AGRESIÓN SUPUESTAMENTE LLEVADA A CABO EN CONTRA DE LA DEMANDANTE POR EL LCDO. DÍAZ COLLAZO.

*653
SEXTO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DICTAR SENTENCIA EN REBELDIA CONTRA UNA PARTE CONCEDIENDO UN REMEDIO DISTINTO AL QUE FUE EXPUESTO Y SOLICITADO EN LA DEMANDA PRESENTADA.

SEPTIMO ERROR: ERRO EL TRIBUNAL DE PRIMERA INSTANCIA EN LA CONCESIÓN DE LOS DAÑOS AL HABER COMPENSADO LOS MISMOS DAÑOS EN FORMA TRIPLE BAJO DISTINTAS DISPOSICIONES LEGALES.

OCTAVO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL DETERMINAR QUE LA DEMANDANTE FUE DESPEDIDA EN FORMA INJUSTIFICADA, TODO ELLO A PESAR DE QUE ESTA ACEPTÓ QUE SUSCRIBIÓ UNA CARTA DE RENUNCIA EN FORMA VOLUNTARIA RELACIONADA CON LA GESTIÓN QUE EL PRESIDENTE DE LA JUNTA DE DIRECTORES ESTABA REALIZANDO PARA QUE SE DIERA A RESPETAR SU POSICIÓN COMO PRESIDENTE DEL HOSPITAL DE MOROVIS.

NOVENO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL NO QUERER TOMAR CONOCIMIENTO JUDICIAL DE LA SENTENCIA DICTADA POR EL TRIBUNAL DE PRIMERA INSTANCIA, EN EL CASO CAC1998-0350, A PESAR DEL CLARO MANDATO QUE SURGE DE LA REGLA 11(B) DE EVIDENCIA, 32 LPRA AP. IV, R. 11(B).

DÉCIMO ERROR: ERRÓ EL TRIBUNAL DE PRIMERA INSTANCIA AL FIRMAR A CIEGAS UN PROYECTO DE SENTENCIA QUE FUE PREPARADO POR LA PARTE DEMANDANTE A REQUERIMIENTO DEL HONORABLE JUEZ AL CONCLUIR LA VISTA EN SU FONDO DEL CASO. ”

III
Por entender que el primer y el sexto señalamiento de error están intrínsecamente relacionados, los discutiremos conjuntamente.
Como primer error, los Apelantes señalaron que el TPI incidió al admitir erróneamente el testimonio de Josefa Díaz para justificar la determinación de-discrimen por razón de género.
En su escrito, los Apelantes alegaron que de la demanda y del informe de conferencia con antelación al juicio no surgía ninguna alegación sobre discrimen por razón de género de manera tal que el TPI pudiera haber concluido y sostenido tal determinación. Añadieron, que solamente existía el testimonio de Josefa Díaz para tratar de justificar el discrimen por género; sin embargo, el mismo no probó ni establéció que Robles fuera discriminada.
Examinadas las alegaciones de la demanda presentada por Robles, surge que su reclamación se basó fundamentalmente en que fue objeto de una campaña de hostigamiento, amenaza, intimidación y acoso emocionar por parte del Ledo. Díaz Collazo a causa de las posiciones asumidas por ella como Directora de Recursos Humanos del MCHC en cuanto a la contratación de cierto personal. De los hechos alegados en la demanda no surge que Robles hubiera sido objeto de discrimen por género por parte del Licenciado mientras fue empleada del MCHC.
En cuanto al testimonio que prestó Josefa Díaz durante el juicio, debemos señalar que el mismo se circunscribió a relatar cuál era el trato por parte del Ledo. Díaz Collazo hacia su persona y las demás mujeres que eran parte de la Junta de Directores del MCHC cuando se llevaban a cabo las reuniones de dicho cuerpo. En particular, declaró que el Licenciado las humillabas y no les permitía hablar en las reuniones. Además, testificó que él le decía a ella que era un “saco de papas y una analfabeta". 
*654 Ahora bien, durante el contrainterrogatorio, Josefa Díaz declaró que Robles no era parte de la Junta de Directores ni presenció los alegados hechos de discrimen en que incurrió el Ledo. Díaz Collazo en contra de las mujeres de la Junta de Directores de la institución hospitalaria. Inclusive declaró que no sabía nada en cuanto a cómo el Ledo. Díaz Collazo trataba a Robles. 
Cabe señalar, que de la transcripción surge que el representante legal de los Apelantes objetó el testimonio de Josefa Díaz bajo el fundamento de que de las alegaciones de la demanda no surgía que la acción instada se tratara de un caso por discrimen por género. Añadió, que la abogada de Robles no podía enmendar las alegaciones cuando se trataba de una reclamación ventilada en rebeldía. Por su parte, el TPI declaró no ha lugar” la objeción levantada por los Apelantes y admitió el testimonio de Josefa Díaz.
En su dictamen, el TPI concluyó que “la evidencia presentada... demuestra que en el MCHC imperaba un ambiente hostil, hostigante y humillante contra la mujer como parte de la cultura organizacional bajo la cual operaba dicha institución bajo el mando del Ledo. Díaz Collazo como Presidente de ^ la Junta de Directores Dicho foro determinó que Robles había sido víctima de discrimen por razón de género.
En los casos en rebeldía, no es posible enmendar las alegaciones por la prueba. Tal enmienda debe ser notificada a las partes, mediante un nuevo emplazamiento, según lo requieren las Reglas 13.2 y 67.1 de las de Procedimiento Civil, 32 L.P.R.A. Ap. Ill, R. 13.2 y 67.1.
En este caso, las alegaciones de la demanda no incluían una causa de acción por discrimen por género. No obstante, durante el juicio en rebeldía, Robles trató de enmendar las mismas mediante la prueba, lo cual fue objetado oportunamente y por el fundamento correcto.
Conforme a nuestro derecho evidenciarlo vigente, un tribunal apelativo no dejará sin efecto una sentencia o decisión por alegado error en la admisión de evidencia a menos que la evidencia fuera erróneamente admitida a pesar de una oportuna y correcta objeción de la parte perjudicada, y que el tribunal considere que dicha evidencia fue el factor decisivo o sustancial en la sentencia cuya revocación se solicita. Regla 4 de Evidencia, 32 L.P.R.A. Ap. IV, R. 4.
Ciertamente, en el caso de marras, el TPI erró al admitir el testimonio de Josefa Díaz. Ello así, resolvemos que el error alegado fue cometido.
En cuanto al sexto error, los Apelantes alegaron que el TPI erró al dictar sentencia en rebeldía concediendo un remedio distinto al que fue expuesto y solicitado en la demanda presentada.
Según ya indicáramos, las alegaciones de la demanda presentada por Robles no incluian una causa de acción por discrimen por género. Por otro lado, de la prueba que se presentó durante el juicio no surge evidencia directa o indirecta que demuestre ella fuera víctima de discrimen, puesto que si el Ledo. Díaz Collazo incurrió en la alegada conducta ello fue en contra de otras personas, según lo declarado por Josefa Díaz.
Las sentencias dictadas en rebeldía no pueden conceder un remedio en exceso de lo solicitado. Regla 43.6 de Procedimiento Civil, 32 L.P.R.A. Ap. III, 43.6. 
A base de lo anterior, el TPI venía obligado a no conceder otros remedios que los solicitados en la demanda, conforme lo dispone la Regla 43.6 de las de Procedimiento Civil. Ello así, no procedía condenar a los Apelantes a pagar cincuenta mil dólares ($50,000) por concepto de daños, sufrimientos y angustias mentales ocasionadas por el discrimen por razón de género. Además, dispuso que dicha partida estaba sujeta a ser duplicada conforme a la Ley Núm. 100, supra, para un total de cien mil dólares ($100,000). Concluimos, el error alegado se cometió.
*655 IV
Por hallarse íntimamente relacionados, discutiremos en conjunto el segundo, tercero, cuarto, y quinto error, los cuales están básicamente dirigidos a impugnar la apreciación de la prueba por parte del TPI.
En lo pertinente, los Apelantes alegaron ante nos que el TPI erró en la apreciación de la prueba al no considerar la totalidad del testimonio de Robles, incluyendo el contrainterrogatorio del cual surgía claramente, a base de sus admisiones, que carecía de una causa de acción. Señalaron que Robles reclamó una compensación por los daños alegadamente sufridos como consecuencia de la persecución y el hostigamiento que sufrió en el lugar de trabajo bajo el derecho a la intimidad reconocido en la Constitución del Estado Libre Asociado de Puerto Rico. Sobre el particular, sostuvieron que Robles admitió que el Ledo. Díaz Collazo no incurrió en ninguna violación a su derecho a la intimidad, pues se limitó a indagar sobre los nombramientos que ella realizaba a petición de Víctor Alicea, Director Ejecutivo de MCHC. Añadieron, que igualmente Robles aceptó que en su contrainterrogatorio que los problemas que ella confrontó en el MCHC surgieron en términos de las discrepancias que existían entre las instrucciones que impartían el Ledo. Díaz Collazo y el Director Ejecutivo. También señalaron que Robles no respetaba la autoridad del Ledo. Díaz Collazo, provocando con ello la confrontación entre la Junta de Directores y Víctor Alicea, situación que alegadamente motivó que ella presentara su renuncia a su posición de Directora de recurso Humanos.
Por otra parte, los Apelantes señalaron que el TPI le concedió a Robles una indemnización de cinco mil dólares ($5,000) bajo el Artículo 1802 del Código Civil, supra, por un alegado incidente en que el Ledo. Díaz Collazo la golpeó en la espalda, a pesar de que ella declaró que no presentó una querella o denuncia y no recibió tratamiento médico y/o psiquiátrico por tal incidente.
De la transcripción del juicio, surge que Robles declaró que comenzó a tener problemas en cuanto al ejercicio de sus funciones como Directora de Recurso Humanos cuando trató de implantar las normas y procedimientos para el reclutamiento del personal, puesto que era uso y costumbre que se contrataba a la gente porque “fulano” lo envió. Como ejemplo de esa situación, señaló que en una ocasión, el Ledo. Díaz Collazo envió a una persona para que fuera contratada en el puesto de “Técnico de EKG”. En ese momento, ella le indicó a Víctor Alicea lo ocurrido, quien le indicó que procediera con el nombramiento de esa persona porque era una amiga del Ledo. Díaz Collazo y él no quería tener problemas. 
Según el testimonio de Robles, en otra ocasión, el Ledo. Díaz Collazo la citó a ella y a otra empleada, Iris Sotomayor, para que asistieran a su oficina. La reunión era para que le apoyaran porque su esposa tenía intenciones de aspirar al puesto de Alcaldesa de Morovis. Al día siguiente, el Ledo. Díaz Collazo llegó a las oficinas del MCHC y exigió la destitución de Sotomayor por ciertos comentarios que alegadamente había hecho en la reunión. Robles se negó a la destitución y en última instancia la empleada no fue despedida. 
También surge del testimonio de Robles, que en enero de 1997, el Ledo. Díaz Collazo representaba a Samuel Morales (Morales), Administrador del MCHC, en un caso de pensión alimentaria. El Licenciado le solicitó que no se le renovara el contrato a Morales hasta que no culminara el litigio. Sobre el particular, Robles indicó que se negó a lo solicitado por el Licenciado, porque entendía que era una burla al tribunal y le dijo a Víctor Alicea que no se iba a prestar para ello. Añadió, que para marzo o abril de 1997, solicitó que la reubicaran porque tenía miedo de que la situación con Morales trajera problemas debido al malestar que existía entre el Ledo. Díaz Collazo y Víctor Alicea, quienes comenzaron a impartir diferentes instrucciones. En ese momento, Víctor Alicea le dijo que se olvidara del problema y continuara con sus funciones. Conforme a las declaraciones de Robles, posteriormente, comenzó a recibir llamadas de parte del Ledo. Díaz Collazo, quien le indicaba que él era quien mandaba y no se tomarían decisiones sin que él diera el visto bueno. En julio, Morales se presentó a las oficinas del MCHC por órdenes del Licenciado para comenzar a trabajar y le dijo a Robles que le preparara la hoja de asistencia. Según Robles, sintió que le estaban faltando el respeto como Directora de Recurso Humanos, debido a que se estaban violando todos los procedimientos. Continuó declarando que no *656 preparó el contrato de Morales y que Ledo. Díaz Collazo la llamaba todos los días preguntando por el mismo y le decía que era una orden de él. Robles relató que se sentía “hostigada, intimidada, amenazada” por el tono en el que él llamaba por lo que ya no quería llegar a la oficina, pues no sabía qué iba a suceder. En esta etapa comenzó a enviar resumes, en busca de otro empleo. 
Continuando con el testimonio de Robles, ésta indicó que para finales de julio recibió una llamada de Víctor Alicea para invitarla a una reunión con la Junta de Directores del MCHC en el restaurante Guajataca. El propósito de la reunión era que ella pudiera informarle a la Junta sobre la situación por la que estaba pasando en el hospital, lo cual hizo.
De acuerdo a la transcripción, Robles también declaró que a principios de agosto recibió una llamada del Ledo. Díaz Collazo para que fuera a su oficina. Ella le pidió que mejor se reunieran en las facilidades del MCHC, pero él insistió en que fuera en su oficina. Según ella, sintió miedo y preocupación. Le notificó a Víctor Alicea que el Licenciado la había citado en su oficina para hablar cosas importantes del trabajo. Una vez en la oficina, el Ledo. Díaz Collazo le mencionó que Víctor Alicea había hecho “un montón de cosas indebidas, que había hecho un montón de cosas que no habían sido autorizadas por la Junta... ”, y puso varios papeles en el escritorio que según él era evidencia que podía hundir y meter preso al Director ejecutivo. También le dijo que sabía que ella había ido a Guajataca y que le había dicho a los miembros de la Junta de Directores del MCHC que se sentía hostigada e intimidada por él y le dijo: “¿Sabes una cosa? Que eso se te cae.” Además le comentó; “Yo puedo acabar con Alicea. Yo te recomiendo que te pongas de parte de nosotros... para que no salgas envuelta en esto ni te veas involucrada en lo del señor Alicea...”. Robles señaló que el Licenciado le comentó que ella había comprado casa, le preguntó por esposo e hijo y le dijo que sabía que ella había solicitado un trabajo en el Hospital de Barceloneta y que tuviera presente que podían pedirle referencias. Ante esta situación, ella le comentó a Alicea que tomara cartas en el asunto, puesto que se sentía incomoda y no aguantaba más la situación, que ella quería conservar su trabajo. 
Los incidentes con el Ledo. Díaz Collazo no terminaron. En su declaración Robles señaló que se habían reclutado a dos (2) personas, pero Víctor Alicea le dijo que una de ellas no podían trabajar en el MCHC porque el Ledo. Collazo Díaz no la quería en el hospital. Finalmente, se contrataron a dichas personas, pero el Licenciado le dijo que no podían trabajar allí y comenzó a llamar todos los días y le decía a Robles que Víctor Alicea estaba “metido en un lío. Más te vale unirte a nosotros. Más vale que hagas lo que yo te diga. Cuídate porque te vas a ver involucrada, te vas a ver involucrada en fraude..”. Robles indicó que se sentía “atropellada, yo me sentí humillada, me sentí que yo estaba allí que no ...sabe, o eres un juguete mío para que yo haga lo que yo quiero o yo voy a hacer ...te voy a destruir.” Declaró que no tenía ninguna opción porque el Ledo. Díaz Collazo era el Presidente de la Junta de Directores y Víctor Alicea no tomaba ninguna acción como su supervisor inmediato. 
Otro incidente que relató Robles durante el juicio, fue que el 21 de agosto de 1997, asistió a una reunión en la que se iban a discutir algunos asuntos relacionados con las labores de varios empleados del Municipio que prestaban sus servicios en el MCHC. La misma fue convocada por Víctor Alicea. A esa reunión se personó el Ledo. Díaz Colón, quien no había sido invitado; ella por cortesía le ofreció que se sentara en su silla. Robles describió que sintió que el Licenciado le puso la mano en el hombro y que sintió un “cantazo en la espalda” y él le dijo “No quédate ahí, siéntate.” Ante esta situación, Robles expuso que ya no aguantaba el acoso, las amenazas, la intimidación y que el hecho de que Ledo. Díaz Collazo le golpeara. Ese mismo día presentó su carta de renuncia. Transcurrieron seis (6) meses en lo que consiguió un nuevo empleo. 
Cabe señalar que en cuanto a este último incidente entre Robles y el Ledo. Díaz Collazo, prestó testimonio Héctor Valeriano Rivera, quien era Secretario Municipal del Municipio de Morovis y conocía al Licenciado. Declaró que transcurridos dos o tres días del incidente, el Licenciado le comentó en su oficina que: “Anoche le di un manotazo y la (sic) senté a Gladys (Robles). ” 
*657 De otra parte, durante el contrainterrogatorio, Robles declaró, en lo pertinente, que no tenía conocimiento de que Víctor Alicea fuera objeto de una investigación en cuanto al uso de los fondos del MCHC ni que la Junta de Directores ya no confiara en él. 
__ Como es sabido, el Tribunal Supremo ha reconocido como norma fundamental de nuestro ordenamiento jurídico que los tribunales apelativos, en ausencia de error, pasión, prejuicio y parcialidad, no deben intervenir con las determinaciones de hechos, la apreciación de la prueba y las adjudicaciones de credibilidad realizadas por el Tribunal de Primera de Instancia. López Vicil v. ITT Intermedia Inc., 142 D.P.R. 857, 864-865 (1997). También ha enfatizado que “un foro apelativo no puede descartar y sustituir por sus propias apreciaciones, basadas en un examen del expediente del caso, las determinaciones tajantes y ponderadas del foro de instancia. ” Rolón García y otros v. Charlie Car Rental, 148 D.P.R. 420, 433 (2000).
Sin embargo, aunque el arbitrio del juzgador de hechos es respetable y merece deferencia, no es absoluto y una apreciación errónea de la prueba no tiene-credenciales de inmunidad frente a la función revisora de este Tribunal. Méndez v. Morales, 142 D.P.R. 26, 36 (1996); Rivera Pérez v. Cruz Corchado, 119 D.P.R. 8, 14 (1987). Por ello, aunque haya evidencia que sostenga las conclusiones de hechos del Tribunal de Primera Instancia, si de un análisis de la totalidad de la evidencia, quedamos convencidos de que se cometió un error, como cuando las conclusiones están en conflicto con el balance más racional, justiciero y jurídico de la totalidad de la evidencia recibida, las consideraremos claramente erróneas. Méndez v. Morales supra• a la página 36; Abudo Servera v. A.T.P.R., 105 D.P.R. 728, 731 (1977).
Surge con claridad de la transcripción que en el juicio desfiló prueba, a la cual el TPI dio entera credibilidad, que demostró que las actuaciones del Ledo. Díaz Collazo tuvieron el efecto de crearle a Robles un ambiente de trabajo intimidante, hostil y ofensivo, por lo que en efecto existía una causa de acción bajo la Ley Núm. 80, supra, que ameritaba la concesión de un remedio.
A tenor con lo anterior, concluimos que los errores segundo, tercero, cuarto y quinto alegados por los Apelantes no fueron cometidos.
V
En su octavo señalamiento de error, los Apelantes sostuvieron que el TPI erró al determinar que Robles fue despedida en forma injustificada, todo ello a pesar de que ésta aceptó que suscribió una carta de renuncia en forma voluntaria relacionada con la gestión que el Presidente de la Junta de Directores estaba realizando para que se diera a respetar su posición como presidente del MCHC.
De los documentos que obran en el expediente, surge la carta de renuncia que presentó Robles el 21 de agosto de 1997 en la que expuso que ‘’’’debido al hostigamiento, intimidación, amenazas, persecución y atropello que constantemente a (sic) mantenido el Presidente de la Junta del Morovis Community Health Center, Inc. (Lie. Manuel Diaz Collazo), y como empleada del Morovis Community Helth Center, Inc. me veo obligada a presentar la renuncia a mi puesto como Directora de Recurso Humanos ... Esta decisión la tomo debido a que esta situación ya a (sic) afectado mi salud emocional y a mi función laboral. Éste sentir lo hice saber a varios miembros de la junta casi al comienzo de esta situación, pero lamentablemente nada se ha hecho”. 
Resulta evidente que de los hechos particulares de este caso, surge que la renuncia de Robles no fue una voluntaria, sino que estuvo motivada por la conducta desplegada por el Ledo. Díaz Collazo.
Conforme al Artículo 5 de la Ley Núm. 180, supra, 29 L.P.R.A. sec.l85e, el despido constructivo constituye una modalidad del despido sin justa causa; es decir, es un despido injustificado. Dicho precepto establece en lo pertinente:

*658
“...[L]a renuncia del empleo motivada por actuaciones del patrono dirigidas a inducirlo o forzarlo a renunciar tales como imponerle o intentar imponerle condiciones de trabajo mas onerosas, reducirle el salario, rebajarlo en categoría o someterlo a vejámenes o humillaciones de hecho o de palabra. ”

La jurisprudencia y las guías interpretativas de la Ley Núm. 80, supra, indican que un despido constructivo sólo procede cuando la persona demuestra que su patrono incurrió en actos voluntarios e injustificados encaminados a obligar al empleado a dejar su empleo y que la única alternativa razonable era la de abandonar su cargo o empleo. S.L.G. Hernández v. Trans Oceanic Life Ins., 151 D.P.R. 754, 777 (2000).
A fin de que se configure el despido injustificado, se requieren los siguientes elementos básicos: (1) las acciones del patrono deben exhibir un nivel de seriedad considerables, no ser simples malentendidos o situaciones antipáticas que no tienen el efecto de crearle al empleado un ambiente de trabajo que resulte intimidante, hostil y ofensivo; y (2) el empleado no puede tener disponible otra alternativa que no sea romper el vínculo obrero-patronal para resolver la situación que enfrenta en su trabajo. Si existe otra opción que pueda resultar razonable para resolver la situación que enfrenta en su trabajo, entonces éste tiene una obligación de recurrir a dicha opción para intentar resolver el asunto. De lo contrario no podrá invocar que fue víctima de un despido constructivo. Es preciso que dichas actuaciones sean arbitrarias, irrazonables y caprichosas, que generen una atmósfera hostil para el obrero, que impidan su sana estadía en el trabajo y que sean originadas por un motivo ajeno al legítimo interés de salvaguardar el bienestar de la empresa. Gestiones administrativas realizadas con el único propósito de salvaguardar el bienestar de la empresa, no dan lugar a un despido constructivo si la intención del patrono al realizar las mismas no era la de lesionar la condición en el empleo del trabajador. Véase, Soc. de Gananciales v. Royal Bank de P.R., 145 D.P.R. 178, 209 (1998). Es por ello que no todos los traslados, reducciones de salario o cambios de condiciones de trabajo dan lugar a un despido constructivo. Id.
Aplicando los anteriores preceptos al caso que nos ocupa, concluimos que en este caso ocurrió un despido constructivo y se lograron establecer los elementos que configuran un despido injustificado bajo la Ley Núm. 80, supra. En esas circunstancias, resolvemos que el octavo error señalado no se cometió.
VI
El séptimo error alegado por los Apelantes versa sobre la concesión de los daños. Según éstos, el TPI compensó los mismos daños en forma triple bajo distintas disposiciones legales.
En su escrito, señalaron que en este caso un sólo acto fue compensado con la indemnización que provee la Ley Núm. 80, la Ley Núm. 100 y el Artículo 1802 del Código Civil de Puerto Rico. Es decir, el mismo daño fue evaluado bajo las tres (3) disposiciones legales en las que el TPI fundamentó su decisión.
En cuanto a este planteamiento, el mismo se ha tornado académico, puesto que en la discusión del primer error concluimos que en este caso no procedía remedio alguno por discrimen por razón de género.
Ahora bien, los seis mil cuatrocientos cincuenta y nueve dólares ($6,459) que ordenó el TPI que se le pagara a Robles por concepto de mesada proceden, puesto que se demostró que en efecto hubo un despido injustificado.
La Ley Núm. 80, supra, establece que todo empleado que fuera despedido de su cargo sin que haya mediado justa causa, tendrá derecho a recibir del patrono, además del sueldo devengado, una indemnización correspondiente de uno a seis meses de sueldo, dependiendo del número de años de servicio del empleado, y una indemnización progresiva adicional equivalente a: “una a tres semanas de sueldo por cada año de servicio”. 29 L.P.R.A. sec. 185a.
*659 De igual forma proceden los cinco mil dólares ($5,000) que concedió el TPI al amparo del Artículo 1802 del Código Civil, supra, como indemnización por la humillación, degradación y los daños emocionales y morales que sufrió Robles como consecuencia de agresión física a la cual fue sometida por el Ledo. Díaz Collazo.
En nuestro ordenamiento, el Tribunal Supremo afirmó que la exclusividad de remedios de las leyes laborales no excluy[e] la responsabilidad civil de un patrono por conducta torticera en que incurriere por otros motivos que no sean la mera violación de una disposición de las leyes del trabajo”. Rivera v. Security Nat. Life Ins. Co., 106 D.P.R. 517, 527 (1977). Así pues, la exclusividad del remedio provisto en la Ley Núm. 80, supra, como indemnización por los daños que le causa el despido - Alvira v. SK & F Laboratories Co., 142 D.P.R. 803, 809-810 (1997)-, subsiste con relación al mero despido sin justa causa "si con el despido concurren otras actuaciones torticeras, que sean independientes al mismo, entonces procede que se responsabilice al patrono a base de dicha conducta". Porto y Siurano v. Bentley P.R., Inc 132 D.P.R. 331 342 (1992).
De conformidad con lo anterior, en Soc. de Gananciales v. Royal Bank de P.R., supra, a las páginas 193-194, el Tribunal Supremo afirmó lo siguiente:

...[Qjueda claro que cuando un obrero contratado sin tiempo determinado es despedido sin justa causa y, además, ha sido objeto de actuaciones que lesionan su derecho a la intimidad o que son constitutivas de ataques a su integridad personal, puede reclamar el pago de la compensación económica en concepto de la mesada y puede, también, instar una acción para reclamar por los daños y perjuicios que dichas actuaciones le han causado. En tal caso, la reclamación por daños se da en función de las actuaciones antijurídicas independientes al hecho del despido que resultan indemnizables al amparo de nuestro ordenamiento jurídico. Claro está, si luego de que el obrero querellante presenta toda su prueba queda demostrado que tan sólo hubo un despido injustificado y que no mediaron actuaciones antijurídicas compensables al amparo del Art. 1802 del Código Civil de Puerto Rico, supra, dicho obrero tan sólo tiene derecho al remedio provisto en la citada Lev Núm. 80. ”

A base de lo anterior, forzoso es concluir que no es correcto como alegan los apelantes de que en este caso el TPI compensó en forma triple los daños que sufrió Robles. Ello así, el séptimo error alegado no se cometió.
vn
En el noveno error, los Apelantes adujeron que el TPI erró al no querer tomar conocimiento judicial de la Sentencia emitida en el caso Víctor Alicea Romanace v. Morovis Community Health Center, Inc., CAC 1998-0350, a pesar del claro mandato que surge de la Regla 11(b) de Evidencia, 32 L.P.R.A. Ap. IV, R. 11(B).
Mediante dicha sentencia, el TPI resolvió que Víctor Alicea fue despedido por justa causa, pues se apropió de fondos del MCHC y mintió al facturar ciertos gastos. En su consecuencia, lo condenó a pagarle al MCHC la cantidad de quince mil dólares ($15,000), más cinco mil dólares por concepto de honorarios de abogado.
En efecto, la Regla 11(B) de las de Evidencia, supra, aclara que: “[ljos tribunales podrán tomar conocimiento judicial... a solicitud de parte cuando ésta provea al tribunal con información suficiente para permitirle que tome tal conocimiento”.
No empece a lo anterior, en este caso, la sentencia a la cual hacen referencia los Apelantes aunque es pertinente a la causa de acción instada por Robles, de haber sido admitida, el resultado del caso no hubiera cambiado. Por ello, el noveno error señalado no fue cometido.
*660 VIH
Finalmente, el décimo error señalado en el escrito de apelación plantea que el TPI erró al firmar a ciegas un proyecto de sentencia que fue preparado por la parte demandante a requerimiento del Honorable Juez al concluir la vista en su fondo del caso.
Los Apelantes adujeron que concluido el juicio, el Juez señaló que declararía “con lugar la demanda y concedería los remedios solicitados y le solicitó a la representación legal de Robles que presentara un proyecto de sentencia. Sostuvieron que el proyecto de sentencia incluye determinaciones de hechos y conclusiones de derecho que no se ajustan a la totalidad de la prueba presentada, puesto que se descartó las contradicciones en que incurrieron los testigos presentados por la parte demandante.
El Cánon 9 de Ética Profesional, 4 L.P.R.A. Ap. IX C. 9, establece que el abogado tiene la obligación de evitar ataques injustificados o atentados ilícitos contra los jueces o contra el buen nombre de la administración de justicia en los tribunales. Por su parte, el Cánon 29, 4 L.P.R.A. Ap. IX C. 29, indica que será altamente impropio de un abogado hacer imputaciones falsas que afecten la reputación y el buen nombre de un compañero ”.
El Tribunal Supremo ha expresado que “...resulta nefasto para la buena práctica de la profesión el que un abogado haga serias imputaciones sobre el obrar de un juez, cuando dichas imputaciones no están avaladas con evidencia contundente e indubitadaIn re: Crespo Enriquez, 147 D.P.R. 656, 663 (1999).
La sentencia emitida por el TPI incluye aquellos hechos que dicho foro entendió que fueron probados. El hecho de que el TPI no haya incluido la prueba que aducen los Apelantes, no da base suficiente de la cual pueda inferirse que el TPI firmó un proyecto de sentencia a ciegas. Por consiguiente, concluimos que el décimo error señalado no se cometió.
IX
Por los fundamentos antes expuestos, modificamos la Sentencia a los efectos de relevar a los Apelantes del pago de los cincuenta mil dólares ($50,000) y los cien mil dólares ($100,000) que fueron concedidos al amparo de la Ley Núm. 100, supra. Así modificada se confirma en todos sus otros extremos.
Lo acordó y manda el Tribunal y lo certifica la Secretaria Interina del Tribunal.
Mildred Ivonne Rodríguez Rivera
Secretaria Interina del Tribunal
ESCOLIOS 2007 DTA 5
1. Véase, la Transcripción al Apéndice del recurso a las páginas 103-110.
2. Id., a las páginas 120-126.
3. Véase, la Determinación de Hecho núm. 79 de la Sentencia al Apéndice del recurso a la página 598.
4. La citada Regla 43.6 dispone:

“Toda sentencia concederá el remedio a que tenga derecho la parte a cuyo favor se dicte, aun cuando ésta no haya solicitado tal remedio en sus alegaciones; sin embargo, una sentencia en rebeldía no será de naturaleza distinta ni excederá en cuantía a lo que se haya pedido en la solicitud de sentencia.

*661 5. Véase la Transcripción al Apéndice del recurso a las páginas 241-243. Además, véase la Determinación de Hecho núm. 21 de la Sentencia apelada a la página 589 del Apéndice.
6. Id., Transcripción al Apéndice del recurso a la página 245 y Determinación de Hecho núm. 22 a la página 589 del Apéndice.
7. Id., Transcripción al Apéndice del recurso a las páginas 246-250 y Determinaciones de Hechos núm. 24-28 a las páginas 589-590 del Apéndice.
8. Id., Transcripción al Apéndice del recurso a las páginas 253-256 y Determinaciones de Hechos núm. 30-37 a las páginas 590-591 del Apéndice.
9. Id., Transcripción al Apéndice del recurso a las páginas 256-263 y Determinaciones de Hechos núm. 39-50 a las páginas 593-595 del Apéndice.
10. Id., Transcripción al Apéndice del recurso a las páginas 267-271 y Determinaciones de Hechos núm. 60-66 a las páginas 596-597 del Apéndice.
11. Id., Transcripción al Apéndice del recurso a las páginas 271-273 y Determinaciones de Hechos núm. 68-70 a la página 597 del Apéndice.
12. Id., Transcripción al Apéndice del recurso a las páginas 147 y 148.
13. Id., a la página 315.
14. Véase, el Apéndice del recurso a la página 1056.